**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

In re:                                    )   Case No. 21-23169-B-11
                                          )
CALIFORNIA INDEPENDENT                    )   DC No. SK-8
PETROLEUM ASSOCIATION,                    )
                                          )
                                          )
                    Debtor(s).            )
_____    )

**MEMORANDUM DECISION GRANTING DEBTOR'S MOTION FOR AUTHORITY TO RETAIN AND COMPENSATE CONSULTANTS UNDER 11 U.S.C. § 363**

Before the court is the *Debtor's Motion for Authority to Retain and Compensate Consultants Utilized in the Ordinary Course of Business* filed by chapter 11 debtor and debtor in possession California Independent Petroleum Association ("Debtor"). The motion is supported by the declaration and supplemental declaration of the Debtor's Chief Executive Officer, declarations of the entities that the Debtor moves to retain as consultants, a reply, and supplemental points and authorities.

Creditors Youth for Environmental Justice, South Central Youth Leadership Coalition, and Center for Biological Diversity (collectively, "NPC") filed an initial opposition and a supplemental response. Other than references to the docket, NPC's initial opposition and the supplemental response are not supported by other evidence. Notably, NPC submitted no evidence that contradicts or otherwise refutes the Debtor's written evidence.

The United States trustee also filed a limited objection to the motion. The limited objection references the docket and includes no additional supporting evidence.

The motion was filed, set, and served under Local Bankr. R.

9014-1(f)(2). It was initially before the court on November 23, 2021, at which time the court ordered a briefing schedule pursuant to Local Bankr. R. 9014-1(f)(2)(C) at NPC's request.

The court has reviewed all relevant documents, declarations, and exhibits. The court has also reviewed and takes judicial notice of the docket. See Fed. R. Evid. 201(c)(1).

The motion is appropriate for disposition without oral argument which will not assist in the decision-making process. See Local Bankr. R. 1001-1(f), 9014-1(h). The continued hearing on January 25, 2022, will be vacated. Findings of fact and conclusions of law are set forth below. See Fed. R. Civ. P. 52(a); Fed. R. Bankr. P. 7052, 9014(c).

**Prefatory Comment**

The Debtor moves for authorization under 11 U.S.C. § 363 to retain and collectively compensate at $50,000.00 per month several entities that provided the Debtor with policy and legislative-related advice, advocacy, guidance, communication, monitoring, research, consulting, and lobbying services in the years and months before this bankruptcy case was filed. The court will refer to the entities as "Consultants" because, as discussed below, that is what the evidence overwhelmingly establishes the entities are.

NPC's initial opposition questions whether the Debtor may retain and compensate the Consultants under § 363. The initial opposition strongly suggests that the Consultants are "professional persons" who must be employed under 11 U.S.C. § 327(a) and compensated under 11 U.S.C. § 330. It also requests

that the court "either deny the Motion in its entirety or set a briefing schedule[.]" Docket 106 at 4:16-17. And it essentially requests injunctive relief insofar as it asks the court to "order the Debtor to stop paying the consultants who are the subject of the Motion pending the Court's ruling on the Motion[.]" Id. at 4:13-14.

NPC has apparently decided to retreat from its initial opposition. Although NPC asks the court to reduce the Consultants' collective monthly compensation by $10,000.00, as does the United States trustee, it now states in its supplemental response that it will defer to the court and the United States trustee on the issue of whether the Consultants are "professional persons" under § 327(a) of the Bankruptcy Code.[1] NPC also states that it reserves the right to revisit the Consultants' compensation, which it characterizes as discretionary spending, in the context of plan confirmation.

**Background**

NPC consists of "three nonprofit environmental and social justice organizations[.]" Youth for Environmental Justice v. City of Los Angeles, 2019 WL 642452 at *1 (Cal. App. 2d Div., Feb. 15, 2019). NPC's mission and its message differ dramatically from the Debtor's core mission and message. NPC and the Debtor are also litigation adversaries.

The Debtor is a California corporation incorporated pursuant to Internal Revenue Code § 501(c)(6). The Debtor filed this

---

[1]The United States trustee takes no position on the issue.

- 3 -

subchapter v chapter 11 case on September 5, 2021.  The Debtor continues to operate and manage its affairs as a debtor in possession under 11 U.S.C. § 1184.

    The Debtor's mission, and its core business purpose, is to promote greater understanding and awareness of the unique nature of California's independent oil and natural gas producers and the marketplace in which they operate including the economic contributions made by California independents to local, state, and national economies, to otherwise foster the efficient utilization of California's petroleum resources, and to promote a balanced approach to resource development and environmental protection in order to improve business conditions for the Debtor's members.  The Debtor generates revenue by performing its core mission.  As a matter of internal operations, the Debtor has determined that the postpetition retention of the Consultants is critical to its ability to continue to perform its core mission.

    Retention of the Consultants also benefits creditors.  In the two years before the Debtor filed its chapter 11 petition it reduced its workforce from eight staff members to four.  This resulted in a reduction in payroll costs from $1,658,000.00 for fiscal year 2019 to approximately $1,052,000.00 expected in 2021.  The Debtor has used the Consultants to fill the gap resulting from the workforce reduction.  In that regard, the Consultants provide services that are otherwise performed by employees without the need for the Debtor to incur insurance, travel, overhead, and other auxiliary costs associated with additional employees.  Use of the Consultants in this capacity has resulted in a cost-effective alternative to hiring additional employees.

The Debtor has identified eight Consultants.[2]  Each Consultant has submitted a declaration that describes in detail its pre- and postpetition services, and which further confirms that the services provided are no different than services that an employee of the Debtor would perform.  The Consultants and their respective services are as follows:

(1) <u>Geosyntech Consultants, Inc. [Docket #120]</u>

- Biweekly Member Meetings: Prepare for and attend biweekly meetings with the Firm, Catalyst Environmental Solutions (Catalyst), and CIPA members. Preparation for biweekly meetings consists of updating graphics, processing data received from data requests, and updating meeting agendas. Meetings have generally been 15 to 30 minutes in duration. Post-meeting activities typically have consisted of reviewing and editing meeting minutes and addressing CIPA members' questions and comments and responding to members' emails.

- Communication with Stakeholders: Provide support through communication as needed to CIPA, its members, and stakeholders. Although the Firm provides general communications, the Firm also will engage in meetings with individual CIPA members to discuss data needs (separate from biweekly meetings and data request memoranda). The Firm also will participate in internal meetings regarding California Environmental Quality Act on behalf of CIPA members, as well as engage in ongoing communication with Catalyst.

- Data Processing and Graphics: Review, processing and verify data received from CIPA members to fill gaps and to refine the current geodatabase such that a strong case for a BPA in the area of interest will be presented. Update the geodatabase and update graphics as data is processed.

- Basin Plan Amendment Work Plan:  Prepare a BPAW.  A draft BPAW will be submitted for review to CIPA

---

[2]The Debtor originally included Alcantar Law Group. Alcantar did not submit a declaration and it is not one of the entities the Debtor seeks to retain under § 363.  In fact, the Debtor acknowledges that Alcantar may be a "professional person" under § 327, Docket 83 at 4:7-10, and agreed to file a retention application for that entity, Docket 109 at 3:21-23, which it did on December 23, 2021.  Dockets 149, 154, 159, & 161.

1  members.  The Firm will incorporate comments and
2  suggestions from CIPA members into the final BPAW prior to submittal to CV-SALTS and the RWQCB.

3  • Regulatory Meetings: Participate in approximately four regulatory meetings: two regulatory meetings with
4  CV-SALTS and two regulatory meetings with the RWQCB.

5  (2)   Tradesman Advisors, Inc. [Docket #121]

6  • Engage agency staff, management and/or other policymakers on an ongoing basis;

7  
8  • Work on the outstanding issues associated with: (i) ARB's Cap and Trade Rulemaking, (ii) ARB's Oil/Gas Methane Rule, (iii) ARB's Short-Lived Climate
9  Pollutants Plan, and (iv) ARB' s 2030 Target Scoping Plan;

10  
11  • Coordinate agency meetings as needed;

12  • Attend necessary public workshops on behalf of CIPA;

13  • Prepare/edit formal comment letters for CIPA's review and submission;

14  • Assist CIPA in creating and providing technical support materials;

15  
16  • Identify and engage key state elected officials and staff, as appropriate;

17  • Work With other trade groups and associations as directed to solve problems in the most efficient
18  manner; and

19  • Engage lead agencies during regulatory adoption proceedings.

20  
21  (3)   Catalyst Environmental Solutions Corporation. [Docket #122]

22  • Monitoring and consulting on permitting at California Geologic Energy Management Division ("CalGEM") and the
23  State Water Resource Board.

24  • Providing objective analysis on proposed regulations and other agency rule changes.

25  
26  • Coordinate industry input on water quality regulations.

27  • Conduct research and studies on industry related issues.
28  

- 6 -

(4) <u>Gualco Group, Inc. [Docket #123]</u>

• Provide CIPA with advocacy, intelligence gathering, analyses, advice and counsel relative to the escalating plethora of oil extraction and wastewater disposal issues pending before the State Water Resources Control Board, the Department of Conservation, specifically, the Division of Oil, Gas & Geothermal Resources ("DOGGR") and key regional water quality control boards.

• Attention will be paid to the implementation of SB 4 (Pavley, Ch. 313, Statutes of 2013) with specific focus on groundwater protection and related issues such as aquifer exemptions.

• Assist in the identification of funding opportunities available as a result of the passage of Proposition 1, commonly referred to as the water bond.

• Keep CIPA alerted to significant developments, including items identified in the Legislature, the Executive Branch and agencies that could either help or hinder our mutual efforts at the SWRCB, DOGGR, the regional water boards, DWR, and other relevant agencies.

• Analyze the current status and impact of CV-SALTS.

• Researching recent relevant State Water Board documents.

• Monitoring a Central Valley Water Board meeting on Thursday and conduct a virtual briefing for CIPA members.

(5) <u>Kester/Pahos [Docket #124]</u>

• Monitoring: Review all proposed legislation, amendments and identify language of potential interest to CIPA. Send copies of proposed legislation and amendment language to CIPA. Provide a description of legislative proposals and amendments and advise CIPA. Maintain a database legislative tracking system, and prepare reports on a regular basis or as requested by CIPA.

• Advocacy: Perform all necessary advocacy services, including legislative advocacy, agency advocacy, negotiations with all relevant parties, testimony in all necessary legislative proceedings, and general advocacy for CIPA's interests (CMTA, WSPA, CCC, etc.). Prepare suggested legislative language for submission to Legislative Counsel and draft proposed amendments for distribution to other parties for purposes of

conducting negotiations.

- Communication: Regularly communicate with CIPA staff, or other individuals requested by CIPA. Mr. Pahos will be available and willing to communicate with CIPA Staff on a regular basis and provide written reports as requested. Mr. Pahos will be reasonably available to attend meetings held by the CIPA Government Affairs Committees and special functions as requested, including, but not limited to, PAC drives, APA events, CIPA's annual meeting, workshops and board meetings. Mr. Pahos will make reasonable appearances before the CIPA membership to communicate relevant issues and help the Academy bring aboard new members.

- Ancillary Services: Provide a professional environment in Sacramento to conduct meetings on behalf of CIPA. Ensure that CIPA is in compliance with all Fair Political Practice Act disclosures.

(6)  Rosencoco Holdings [Docket #125]

- Kern County EIR/Oil & Gas Permitting - represent CIPA on committee(s) to ensure that its members' interests and concerns are addressed. Provide written reports to keep CIPA staff and members abreast of issues that have potential operational and/or fiscal impact on members.

- USGS Water Quality Studies - stay abreast of reporting that is put forth by the USGS in their ongoing groundwater sampling program and convey status of program to CIPA members. Establish a working relationship with key USGS personnel, determine USGS calendar and plans for the USGS next steps. Establish uniform policy for CIPA members on presenting a consistent response to USGS requests.

- Regulatory Relief with CalGEM - During these unusual times of a worldwide pandemic work with CalGEM management to ensure that CIPA members are able to stay in CalGEM compliance without undo health and safety risk to their employees and contractors. During times of economic downturn work with CalGEM to establish protocol that will minimize economic hardship on CIPA members while maintaining environmental and safety compliance per CalGEM regulations.

- OSPR-work with CIPA [] in developing cost-effective training programs that will comply with statutory changes resulting from AB 1197, CDFW OSPR regulations. Training will result in certification of spill management teams, uniform drill training/scenarios and establishment of OSRO resources for members.

- As requested by CIPA, attend public meetings and

provide public comments on issues as directed by CIPA management and staff; public comments to be delivered will be prepared in advance of meetings and approved by CIPA prior to presentation.

- Prepare position papers and/or comments on specific issues for release by CIPA when requested to do so.

- Prepare status reports as directed and present to CIPA membership (at Board meetings) as requested.

(7) <u>Cornerstone Engineering, Inc. [Docket #126]</u>

- Provide a dedicated lead person to track the government actions on the items listed below, convene CIPA members interested in the topic, and help coalesce an association position. Deliverables to CIPA in this role are comment letters, meeting notes, and sometimes meetings or public comments before governmental agencies or decision-making bodies.

- Issues of special concern to CIPA members that Cornerstone will track and assist include, without limitation:

(1) LA County Sustainability Plan-CIPA's January 2021 comment letter faced head-on the County's stated goals of fossil fuel elimination, fence-line monitoring, and setbacks. Cornerstone will pick up tracking and engaging in the process to ensure that the adopted plan doesn't unduly disadvantage our industry nor the County's citizens.

(2) Non-Conformity/Amortization-CIPA members face a relatively new tactic from local jurisdictions of shutting in oil production in the name of nonconformity/amortization. Culver City, City of Los Angeles, and County of Los Angeles are using these tools to shut down production. Cornerstone will coordinate members to engage and respond to maneuvers by local agencies associated with "takings-by-amortization".

(3) Zoning Memo 133-In September 2016, Los Angeles City Zoning Administrator issued "Memo 133" essentially inserting themselves into oil well permitting through the "Plan Approval" process and re-writing CEQA to take otherwise legal avenues for determination off the table for oil & gas. City representatives are evidently open to CIPA member input on what activities trigger the zoning memo and how it is implemented. Cornerstone will provide structure to members' dialogue in this regard and keep conversations open with the City.

(4) LA Fire Idle Well Regs-The City of Los Angeles

attempts to trump CalGEM's definition of "idle wells" and in doing so, has overly-burdensome idle well regulations that conflict with the state's regulations. Cornerstone will organize members to work with the City to avoid preemption while responding to the spirit of the City's idle well expectations.

(5) Cyclic Steam—It has been a year since CalGEM issued NTO 2020-02 placing a moratorium on approval of new cyclic steam operations. Cornerstone will engage with the state on where things stand, open issues of concern, and organize member producers to address issues with the aim of releasing the cyclic steam moratorium.

(8) <u>Independent Oil Producers' Alliance [Docket #127]</u>

Services include, but are not limited to, monitoring regulations and activities pertaining to the oil and gas industry by the Central Valley Air Pollution Control Board and the Central Valley Regional Water Board.

None of the Consultants are prepetition creditors or an insider of the Debtor. And none of the Consultants hold any position on the Debtor's board or executive committee.

**Discussion**

*The Consultants are not "Professional Persons" Under § 327(a).*

The Consultants are not "professional persons" under § 327(a).[3] Although there is limited Ninth Circuit authority on the issue, In re East Coast Foods, Inc., 2019 WL 6893015 at *6

---

[3] Section 327(a) states as follows:
(a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.
11 U.S.C. § 327(a).

- 10 -

(C.D. Cal. Dec. 8, 2019), the Ninth Circuit Bankruptcy Appellate Panel has opined that:

> Not every person employed by a trustee is a 'professional person' within the meaning of § 327. A 'professional person' is one who takes a central role in the administration of the bankruptcy estate and in the bankruptcy proceedings. Individuals or entities that perform mechanical, nondiscretionary tasks are not 'professional persons' within the meaning of § 327.

Blair v. Stratton (In re Blair), 329 B.R. 358, 2005 WL 2009303 at *4 (9th Cir. BAP June 20, 2005) (internal quotations and citations omitted). Other courts consider a number of factors when determining whether an entity or an individual is a "professional person" under § 327(a).

In In re Nine West Holdings, Inc., 588 B.R. 678 (Bankr. S.D.N.Y. 2018), the bankruptcy court authorized the debtor's postpetition retention and compensation of prepetition consultants under § 363 and in so doing rejected the United States trustee's argument that the consultants were professionals under § 327(a). In reaching its decision, the court noted that the debtor retained the consultants years before it filed bankruptcy. It also noted that the consultants' services did not involve substantive decision-making, were largely administrative, were limited to day-to-day operations that supplanted in-house functions, and were required without regard to the debtor's bankruptcy filing.

The court in In re Heritage Home Group LLC, *et al.*, 2018 WL 4684802 (Bankr. D. Del. Sept. 27, 2018), reached a similar result holding that the debtor's liquidation consultant was not a "professional person" under § 327(a). Central to the decision

- 11 -

was that the consultant's role was advisory.  The consultant also was not intimately involved in the bankruptcy case, had no role in the preparation or negotiation of a reorganization plan, had no discretion with regard to the debtor's business decisions, and its role was limited to making recommendations to the debtor.

　　　Several days later, a different bankruptcy judge in the same district reached the same conclusion in a different case.  In re Brookstone Holdings Corp., 592 B.R. 27 (Bankr. D. Del. 2018), the court held that the debtor's prepetition consultant was not a "professional person" and therefore could be retained under § 363 without regard to § 327(a).  The court again noted that the consultant's role was advisory, the debtor remained in complete control over all aspects of the business, and the consultant was not involved in negotiating the terms of a reorganization plan.

　　　In reaching their respective decisions, the courts in Heritage Home and Brookstone relied on a number of non-exclusive factors.  These factors (paraphrased) are as follows:

　　　1.　whether the entity or individual controls, manages, administers, invests, purchases, or sells assets that are significant to the debtor's reorganization;

　　　2.　whether the entity or individual is involved in negotiating the terms of a plan of reorganization;

　　　3.　whether the entity or individual is directly related to the type of work carried out by the debtor or to the routine maintenance of the debtor's business operations;

　　　4.　whether the entity or individual is given discretion or autonomy to exercise professional judgment in some part of the administration of the debtor's estate;

　　　5.　the extent of the entity's or individual's involvement in the administration of the debtor's estate; and

>     6. whether the entity's or individual's services involve some degree of special knowledge or skill, such that the employee can be considered a 'professional' within the ordinary meaning.

Brookstone, 592 B.R. at 34-35.

These factors are persuasive and instructive. The court will therefore rely on them here.

The Consultants do not-and are not retained to-administer, invest, purchase, or sell the Debtor's assets. In fact, there is no evidence that the Consultants have anything to do with the Debtor's assets.

There is no evidence that the Consultants are or will be involved in the negotiation of plan terms.

Inasmuch as the Consultants' services are critical to the Debtor's ability to perform its core mission and they correlate with internal tasks that an employee would otherwise perform but for the Debtor's workforce reduction, the Consultants' services relate directly to the type of work carried out by the Debtor. Moreover, that the Consultants were retained to provide these services well before this bankruptcy case was filed further demonstrates that the Debtor did not retain the Consultants for the purpose of administering this chapter 11 case and that the Consultants were retained instead for fundamental business purposes unrelated to this case.

The Consultants lack discretion and autonomy to exercise professional judgment in the administration of the estate and the Debtor's affairs. As an initial matter, there is no evidence that the Consultants are or will be involved in any aspect of this bankruptcy case or estate administration. Inasmuch as the

Consultants interact only with the Debtor, to the extent they are involved in this case their involvement is tangential and not central.[4] See In re That's Entm't Mktg. Grp., Inc., 168 B.R. 226, 230 (N.D. Cal. 1994).

The Consultants also lack discretion and autonomy to exercise their professional judgment with regard to the Debtor's affairs. They serve in an advisory capacity. They also monitor events, collect and research information, meet with the Debtor and its members, and make recommendations to the Debtor and its members based on the foregoing. To the extent any of the Consultants lobby for the Debtor or have contact with boards or elected officials on the Debtor's behalf, they do so subject to the Debtor's direction and control. In other words, the Debtor retains control of any message the Consultants convey to the outside world for or on the Debtor's behalf.

The only factor that possibly weighs in favor of characterizing the Consultants as § 327(a) "professional persons" is the sixth factor. But even that is weak, and the factor is not controlling in the overall analysis. Moreover, the court in Brookstone found this factor "entirely unhelpful" because "literally all business and service activities require

---

[4]The court notes that the Consultants' interaction with the Debtor in this case is significantly less than the interaction between the consultants and the respective debtors in Nine West and Brookstone. The consultants in the former served as the debtor's CEO and in the latter the consultant served as the sole entity that disposed of and monetized the debtor's inventory. The point here is that in Nine West and Brookstone interaction between the consultants and the debtors was constant and ongoing whereas in this case interaction between the Consultants and the Debtor is sporadic and "as-needed."

'specialized knowledge or skill' on the part of the service provider." Brookstone, 592 B.R. at 37. This court agrees. Additionally, the court must consider this factor in the context of the BAP's statement in Blair that a professional plays a "central" role in the administration of the bankruptcy estate and proceedings. And as noted above, the other factors overwhelmingly establish this is not the case here.

Based on the foregoing, the court concludes that the Consultants are not "professional persons" which means that the Debtor may retain and compensate the Consultants in the ordinary course of its business under § 363(c) and without regard to §§ 327(a) and 330. Alternatively, to the extent that authorization to retain and compensate the Consultants is necessary under § 363(b), the court grants such authorization.

The Debtor is also authorized to collectively compensate the Consultants no more than $50,000.00 monthly. Any unused portion in a particular one-month period may be rolled over to the following month for future compensation. But in no event shall the Consultants' collective compensation for a particular one-month period exceed $50,000.00. Because the evidence before the court supports the conclusion that the Debtor uses the Consultants to perform its core mission and that the Debtor generates revenue by performing its core mission, the court views the Consultants' compensation as critical to the reorganization process and not discretionary spending as NPC suggests.

In the interests of transparency and disclosure, the following protocols will also apply to any future consultant the Debtor may elect to retain and compensate: (1) any newly-

- 15 -

retained consultant shall file a verified statement or declaration similar to the declarations the Consultants filed in support of the Debtor's motion; (2) parties in interest will have an opportunity to object to a future proposed consultant's retention within fourteen (14) days after a verified statement or declaration is filed; and (3) the Debtor shall itemize payments to each Consultant on its monthly operating reports.

*Retention and Compensation of the Consultants is a Valid Business Judgment and in the Best Interest of Creditors.*

　　　Retention and compensation of the Consultants under § 363 is a valid exercise by the Debtor of its business judgment and in the best interest of creditors for at least two reasons. First, the Consultants are critical to the Debtor's ability to perform its core mission which is critical to the Debtor's ability to generate the revenue it will need to fund a chapter 11 plan and pay creditors. Second, the Debtor's use of the Consultants in the capacity of as-needed employees reduces operational costs which increases funds available to the Debtor to pay creditors under a chapter 11 plan. The Debtor's business judgment on these matters is entitled to substantial deference. Simantob v. Claims Prosecutor, LLC (In re Lahijani), 325 B.R. 282, 289 (9th Cir. BAP 2005).

　　　One final note. It is entirely inappropriate for NPC - as unsecured creditors and apparently the Debtor's philosophical, political, and litigation nemeses - to use these bankruptcy proceedings to undermine the Debtor's business judgment on matters that pertain to the Debtor's internal operations. In that regard, NPC's decision to retreat from its initial

opposition is a wise one.  Recall that at the inception of this case NPC vehemently asserted that it expects full payment of its state court judgment against the Debtor.  See Docket 37 at 3:4-6, 6:1-2.  Having made that assertion it would be bad faith and an improper use of these bankruptcy proceedings for NPC to then take a position that effectively deprives the Debtor of critical resources the Debtor needs to perform its core mission, generate revenue, and pay the judgment that NPC asserts the Debtor must pay in full.  However, given NPC's supplemental response, the court need not reach this issue.

**Conclusion**

For the foregoing reasons, and other good cause appearing, the motion will be granted to the extent stated hereinabove and the continued hearing on January 25, 2022, at 9:30 a.m. will be vacated.

A separate order will issue.

**Dated:** January 18, 2022

**Christopher D. Jaime, Judge**
**United States Bankruptcy Court**

- 17 -

**INSTRUCTIONS TO CLERK OF COURT**
**SERVICE LIST**

The Clerk of Court is instructed to send the attached document, via the BNC, to the following parties:

Ian S. Landsberg
1880 Century Park East Suite 300
Los Angeles CA 90067

Carl L. Grumer
11355 W Olympic Blvd
Los Angeles CA 90064

Lisa A. Holder
3710 Earnhardt Dr
Bakersfield CA 93306

Paul J. Pascuzzi
500 Capitol Mall, Suite 2250
Sacramento CA 95814

Adam B. Wolf
4 Embarcadero Center, Suite 1400
San Francisco CA 94111

Jason M. Blumberg
501 I St #7-500
Sacramento CA 95814