Total Pages: **48**

**SKLAR KIRSH, LLP**
IAN S. LANDSBERG (SBN 137431)
Email: ilandsberg@sklarkirsh.com
LOVEE D. SARENAS (SBN 204361)
Email: lsarenas@sklarkirsh.com
1880 Century Park East, Ste. 300
Los Angeles, California 90067
Telephone: (310) 845-6416
Facsimile: (310) 929-4469

Counsel for Debtor California
Independent Petroleum Association

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| In re<br><br>CALIFORNIA INDEPENDENT<br>PETROLEUM ASSOCIATION,<br><br>   Debtor and Debtor-in-Possession. | Case No.: 21-23169-B11<br><br>**DCN    SK-15**<br><br>Chapter 11-Subchapter V<br><br><u>Hearing:</u><br>Date: [TBD]<br>Time: [TBD]<br>Place: 32, Dept. B<br>    501 I Street, 6th Floor<br>    Sacramento, CA 95814 |

## <u>PLAN OF REORGANIZATION (SUBCHAPTER V)</u>

California Independent Petroleum Association, a California corporation incorporated pursuant to Internal Revenue Code § 501(c)(6) and the chapter 11 debtor and debtor-in-possession herein in this bankruptcy case ("<u>Debtor</u>"), hereby submits this "*Plan of Reorganization (Subchapter V)*" (the "<u>Plan</u>"), and represents as follows:[1]

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such terms as set forth in Article II.

4872-6147-6612.6

# ARTICLE I.

## INTRODUCTION

### A.    Summary of Plan and Distribution to Creditors[2]

This Plan is intended to provide a proposed means for restructuring Debtor. On the Petition Date, Debtor commenced this bankruptcy case by filing a voluntary petition under Chapter 11, Subchapter V, of the Bankruptcy Code, which permits Debtor, as the plan proponent, to propose a plan of reorganization that allows Debtor to reorganize by continuing to operate.

The Plan is a reorganization plan in which Debtor has reorganized its business operations to enable it to make orderly distributions to creditors of Debtor's Estate on their prepetition claims. This Plan provides for 1 class of secured claims (Class 1), one class of Priority Unsecured Claims (Class 2) and 1 class of General Unsecured Claims (Class 3). Because Debtor is a California corporation incorporated pursuant to Internal Revenue Code § 501(c)(6), Debtor is not organized for profit and no part of Debtor's net earnings inures to the benefit of any private shareholder or individual. As such, there is no class of interest holders receiving any distributions under the Plan.

This Plan also provides for the payment of allowed administrative priority claims and allowed priority tax claims upon confirmation of the Plan from both (i) available cash on hand as of the Confirmation Date, and (ii) future disbursements from Debtor's projected earnings from operations to the extent that there is insufficient cash available to pay such claims in full on the Effective Date of the Plan. The Plan also provides for the payment of Allowed General Unsecured Claims from future disbursements from Debtor's projected earnings from operations to Holders of Allowed General Unsecured Claims. Distributions to secured creditors will be according to the terms of their security interests and the Plan.

Payments under the Plan will be made from: (i) cash on hand Debtor has accumulated as of the Effective Date, which is estimated in the amount of approximately $372,000; (ii) net operating revenues from the on-going operations of Debtor's Business that will allow Debtor to make Periodic Distributions to Holders of Allowed Claims in accordance with the Payment

---

[2] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such terms in Article II of this Plan.

Distribution Schedule; and/or (iii) proceeds from finance arrangements Debtor obtains after the Effective Date that allows Debtor to make a Remaining Lump Sum Payment to Holders of Allowed Claims in lieu of Periodic Distributions. Debtor estimates that substantial consummation of the Plan by satisfaction of the Total Plan Payment will be accomplished within sixty (60) months from the Effective Date of the Plan, or, alternatively, on such earlier date as Debtor may be able to obtain sufficient financing to pay the Remaining Lump Sum Payment to Holders of Allowed Claims. The exact percentage distribution on account of General Unsecured Claims will depend on the total amount of Claims Allowed in this Case. All parties should refer to the below sections of the Plan for the precise treatment of a particular claim.

As contemplated by 11 U.S.C. § 1187, no separate disclosure statement has been prepared in this case.

**DEBTOR URGES YOU TO VOTE "YES" ON THE PLAN.**

**B.** **Purpose of This Document**

This document tells you certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether to confirm the Plan. This Plan cannot tell you everything about your rights and how your rights may be affected by the terms and conditions set forth herein. You should consult your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

The Plan is being provided to you to enable you to make an informed judgment about the Plan and contains information concerning, among other matters: (1) the business background and history of Debtor; (2) significant events during the Chapter 11 case, and (3) a summary of the Plan's terms, including its proposed treatment of different Classes of Claims under the Plan. Debtor urges you to carefully review the full contents of this Plan, including all exhibits and attachments, before making a decision to accept or reject the Plan, paying particular attention to the provisions affecting your rights as a Claim Holder. To assist you in your review, please note that a list of definitions appears in Article II of this document.

**C.**      <u>Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing</u>

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THE CASE.

PLEASE REFER TO THE "*ORDER SETTING CONFIRMATION HEARING AND RELATED DEADLINES*" THAT ACCOMPANIES THIS PLAN FOR IMPORTANT DATES AND DEADLINES RELATING TO THIS PLAN, INCLUDING, WITHOUT LIMITATION: (I) THE TIME AND PLACE OF THE HEARING AT WHICH THE BANKRUPTCY COURT WILL DETERMINE WHETHER OR NOT TO APPROVE THE PLAN; (II) THE DEADLINE FOR VOTING FOR OR AGAINST THE PLAN; AND (III) THE DEADLINE FOR FILING AN OBJECTION TO CONFIRMATION OF THE PLAN, INCLUDING ANY OBJECTIONS TO THE PROPOSED CURE AMOUNTS RELATED TO DEBTOR'S ASSUMPTION OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS.

Any interested party desiring further information about the Plan should contact Ian S. Landsberg, Esq., 1880 Century Park East, Ste. 300, Los Angeles, California 90067; Telephone: (310) 845-6416; Email: ilandsberg@sklarkirsh.com, with a copy to Lovee D. Sarenas, Esq., Email: lsarenas@sklarkirsh.com.

**D.**      <u>Disclaimer</u>

The financial data relied upon in formulating the Plan is based on Debtor's books and records. None of that financial data has been audited or otherwise independently verified by Debtor. Based upon information disclosed by Debtor, Debtor represents that everything stated in the Plan is true and correct. The declaration of Rock Zierman (the "<u>Zierman Declaration</u>"), Debtor's Chief Executive Officer, is being filed concurrently herewith. The Bankruptcy Court has not yet determined whether the Plan is confirmable and makes no recommendation as to whether you should support or oppose the Plan.

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and as further provided herein, Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan.

## ARTICLE II.

## DEFINITIONS; RULES OF INTERPRETATION

**A.**     **Definitions**

The following definitions shall apply in this Plan:

1. "Administrative Claim" shall mean any Claim for any cost or expense of administration allowed against Debtor under § 503(b) of the Bankruptcy Code including, without limitation, any (i) actual and necessary costs and expenses of preserving the Estate of Debtor, (ii) actual and necessary costs and expenses of operating the Business of Debtor, (iii) indebtedness or obligation incurred or assumed by Debtor in connection with the conduct of its Business, or for the provision of goods or the rendering of services to Debtor, (iv) all compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court by Final Order under § 330 of the Bankruptcy Code, whether arising before or after the Effective Date, and (v) any fees or charges assessed against the Estate of Debtor under 28 U.S.C. § 1930.

2. "Allowed" shall mean, with respect to any Claim, such Claim or any portion thereof: (i) to which Debtor has assented to the validity; (ii) that is allowed pursuant to the terms of this Plan, (iii) that is allowed by agreement between the Holder of such Claim and Debtor or the Reorganized Debtor, as applicable, or (iv) with respect to which a proof of claim has been timely filed with the Bankruptcy Court or which is scheduled in the list of creditors prepared and filed with the Bankruptcy Court by Debtor, as amended from time to time, and which is not listed as disputed, contingent or unliquidated and, in either case, as to which no objection to allowance thereof has been interposed within the applicable period of limitations fixed by the Bankruptcy Court, or as to which any such objection has been determined by an order or judgment which has become a Final Order, or is not a Disputed Claim. An Allowed Claim shall not include any unmatured or post-petition interest unless otherwise stated in the Plan.

3.    "<u>Appraisal Report</u>" shall mean that certain appraisal report prepared by Valbridge dated November 10, 2021, a copy of which is attached as <u>Exhibit 4</u> to the Plan Exhibits List.

4.    "<u>Avoidance Action</u>" shall mean a claim or cause of action of the Estate arising out of or maintainable pursuant to sections 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b) or 553 of the Bankruptcy Code or under any other similar applicable law, regardless of whether or not such action has been commenced prior to the Effective Date.

5.    "<u>Bankruptcy Code</u>" shall mean title 11 of the United States Code, section 101, *et seq.,* as now in effect or hereafter amended to the extent such amendments apply to the Case. Unless otherwise indicated, all citations in this Plan are to the Bankruptcy Code.

6.    "<u>Bankruptcy Court</u>" shall mean the United States Bankruptcy Court for the Eastern District of California, in which the Case is currently pending, or such other court of competent jurisdiction that is exercising jurisdiction over the Case at the time of Confirmation.

7.    "<u>Bankruptcy Rules</u>" shall mean the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended to the extent such amendments apply to the Case.

8.    "<u>Bar Date</u>" shall mean the last date for filing Claims against Debtor and its Estate, which date has been set by the Bankruptcy Court as November 15, 2021 for Claims filed by non-government entities, and as March 4, 2022 for Claims filed by government entities.

9.    "<u>Business</u>" shall mean Debtor's business, which is primarily a nonprofit trade association based in Sacramento, California, which represents members comprised of crude oil and natural gas producers, royalty owners, and service and supply companies operating in various locations in the State of California.

10.    "<u>Case</u>" shall mean California Independent Petroleum Association, Case No. 21-23169-B11, currently pending in the Bankruptcy Court.

11.    "<u>Cash</u>" shall mean legal tender of the United States of America.

12.    "<u>City</u>" shall mean the City of Los Angeles.

13.    "<u>Claim</u>" shall mean a "claim" as defined in section 101(5) of the Bankruptcy Code.

14.    "<u>Class</u>" shall mean any grouping into which Claims are classified pursuant to this Plan.

15.    "<u>CNGPA</u>" shall mean California Natural Gas Producers Association, a wholly owned subsidiary of Debtor.

16.    "<u>Confirmation</u>" shall mean the confirmation of this Plan by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code.

17.    "<u>Confirmation Date</u>" shall mean the date on which the Confirmation Order is entered by the clerk of the Bankruptcy Court.

18.    "<u>Confirmation Order</u>" shall mean the order of the Bankruptcy Court confirming the Plan under section 1129 of the Code.

19.    "<u>Debtor</u>" shall mean California Independent Petroleum Association, debtor and debtor-in-possession in this Case.

20.    "<u>Disallowed</u>" means, with respect to any Claim, such Claim or any portion thereof that (a) has been disallowed by an order or judgment of the Bankruptcy Court or other court in which the merits of the Claim were adjudicated pursuant to the Plan, or (b) disallowed by agreement between the Holder of such Claim and Debtor or the Reorganized Debtor.

21.    "<u>Disputed Claim</u>" shall mean (a) a Claim as to which Debtor has interposed an objection or filed a request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any Claim otherwise disputed by Debtor, the Reorganized Debtor, or other party-in-interest in accordance with applicable law, including, without limitation, through the appeal process in the Bankruptcy Court or any other court with jurisdiction over the matter, which objection or appeal has not been withdrawn or determined by a Final Order, (b) a Claim scheduled by Debtor as contingent, unliquidated, or disputed, (c) a Claim which amends a Claim scheduled by Debtor as contingent, unliquidated, or disputed, (d) a Claim prior to it having become an Allowed Claim, or (e) any Claim, or portion thereof, claimed in a proof of claim as zero or undetermined.

22.    "<u>Effective Date</u>" shall mean the first business day after the fourteenth (14) day after the Confirmation Date.

23. "<u>Estate</u>" shall mean the estate created in the Case pursuant to section 541 of the Bankruptcy Code.

24. "<u>Exhibit</u>" shall mean an exhibit specifically referenced in this Plan as amended, modified or supplemented from time to time, and attached to the Plan Exhibits List filed concurrently with the Plan.

25. "<u>FCB</u>" shall mean First Citizen Bank, as Debtor's prepetition lender with a first priority security interest in the Property.

26. "<u>Final Order</u>" shall mean an order or judgment of the Bankruptcy Court or any other court that may exercise jurisdiction over such matter, including, without limitation, the court presiding over the State Court Action, that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

27. "<u>General Unsecured Claim</u>" shall mean any unsecured Claim, other than an Administrative Claim, Priority Unsecured Claim, or Priority Tax Claim.

28. "<u>Holder</u>" shall mean a holder of a Claim or such holder's designee.

29. "<u>Impaired</u>" shall mean, when used in reference to a Claim, a Claim that is in a class that is impaired within the meaning of section 1124 of the Bankruptcy Code.

30. "<u>IPEX</u>" shall mean Independent Producers Exchange, a wholly owned subsidiary of Debtor.

31. "<u>Judgement Creditors</u>" shall mean both the Nonprofit Creditors and the City.

32. "<u>Nonprofit Creditors</u>" shall mean the Creditors Youth for Environmental Justice, South Central Youth Leadership Coalition, and Center for Biological Diversity.

33. "<u>Payment Distribution Schedule</u>" shall mean the schedule prepared by Debtor and attached to the Plan Exhibits List of amounts and timings of distributions to be paid by the Reorganized Debtor to Holders of Allowed Claims under the Plan.

34. "<u>Periodic Distributions</u>" shall mean the distributions identified on the Plan Distribution Schedule to be paid at the specified dates over a 60 month period from the Effective Date by the Reorganized Debtor to Holders of Allowed Claims under the Plan.

35.    "<u>Petition Date</u>" shall mean September 5, 2021, the date on which Debtor filed its Chapter 11 petition with the Bankruptcy Court.

36.    "<u>Plan</u>" shall mean this plan of reorganization in its entirety, including all addenda, exhibits, schedules, and other attachments hereto, as amended or modified from time to time.

37.    "<u>Plan Exhibits List</u>" shall mean the "*Exhibits in Support of Debtor's Plan of Reorganization (Subchapter V)*" filed concurrently herewith in support of this Plan, as may be amended, modified or supplemented from time to time.

38.    "<u>Plan Payment Projections</u>" shall mean the financial projections prepared by Debtor and attached to the Plan Exhibits List as <u>Exhibit 2</u> estimating net revenues from continued operations of the Business during the approximately sixty (60) months following the Effective Date.

39.    "<u>PPP Loan</u>" shall mean that certain General Unsecured Claim of Valley Republic Bank based upon the guaranty of payment by the SBA under its payment protection program pursuant to which Valley Republic Bank loaned Debtor on or about February 19, 2021 the principal amount of $201,250.00.

40.    "<u>Priority Tax Claim</u>" shall mean any unsecured Claim which is entitled to priority pursuant to § 507(a)(8) of the Code.

41.    "<u>Priority Unsecured Claim</u>" shall mean any unsecured Claim, other than an Administrative Claim or a Priority Tax Claim, which is entitled to priority pursuant to § 507(a) of the Bankruptcy Code.

42.    "<u>Professional(s)</u>" shall mean (a) the Subchapter V Trustee; (b) Sklar Kirsh, LLP, bankruptcy counsel to Debtor employed in the Case by order of the Bankruptcy Court; (c) Arch & Beam Global, LLC, financial advisors to Debtor employed in the Case by order of the Bankruptcy Court; (d) Manatt, Phelps & Phillips LLP, as special counsel to Debtor; (e) Alcorn Law Corporation, as special counsel to Debtor; and (f) Alcantar Law Group LLP, as special counsel to Debtor.

43.    "<u>Remaining Lump Sum Payment</u>" shall mean the final distribution to be made to Holders of Allowed Claims in the amount of the Total Plan Payment, less any Periodic Distributions made in satisfaction of the Total Plan Payment at the time of such final distribution, as discounted to present net value on the date, if any, that the Reorganized Debtor elects to make an early

disbursement of the Remaining Lump Sum Payment, as further provided and identified in the Payment Distribution Schedule.

44. "<u>Reorganized Debtor</u>" shall mean the Estate of Debtor, as modified and restructured by the Plan after the Effective Date.

45. "<u>SBA</u>" shall mean the United States Small Business Administration.

46. "<u>Secured Claim</u>" shall mean any Claim which is secured by a validly perfected security interest.

47. "<u>Schedules</u>" shall mean the Schedules of Assets and Liabilities and Statement of Financial Affairs, as amended from time to time, filed by Debtor in the Case listing, among other things, assets and liabilities of the Estate.

48. "<u>State Court</u>" shall mean the Superior Court of the State of California, County of Los Angeles.

49. "<u>State Court Action</u>" shall mean the lawsuit entitled *Youth for Environmental Justice, South Central Youth Leadership Coalition, and Center for Biological Diversity v. City of Los Angeles, et al.*, Case No. BC 600378, and filed in the State Court.

50. "<u>Subchapter V Trustee</u>" shall mean Lisa A. Holder, the trustee appointed under subchapter V of title 11 in this Bankruptcy Case.

51. "<u>Total Plan Payment</u>" shall mean the total of all Periodic Distributions set forth in the Payment Distribution Schedule, as discounted to present net value on the date, if any, that the Reorganized Debtor elects to make an early disbursement of the Remaining Lump Sum Payment, as further provided and identified in the Payment Distribution Schedule.

52. "<u>Unimpaired</u>" shall mean a Claim that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

53. "<u>UST</u>" shall mean the Office of the United States Trustee.

54. "<u>Valbridge</u>" shall mean Valbridge Property Advisors | Northern California, d/b/a Hulberg & Associates, Inc., the real property appraiser hired by Debtor and approved by the Bankruptcy Court in this Case.

Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**B.        Rules of Interpretation**

For purposes of this Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (c) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (d) all references in this Plan to Sections and Articles are references to Sections and Articles of or to this Plan; (e) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (g) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; and (j) "including" means "including without limitation."

All Exhibits referenced herein and/or set forth in the Plan Exhibits List are incorporated into and are a part of this Plan as if set forth in full herein.  The documents contained in the Exhibits shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

**III.**

**BACKGROUND**

A.    **Description Debtor's Business and the Bankruptcy Filing**

1.    **Debtor's Non-Profit Business Operations**

Debtor is a long-standing not-for-profit, non-partisan trade association based in Sacramento, California, which has been in business for over 46 years.  Debtor represents approximately 350 crude oil and natural gas producers, royalty owners, and service and supply companies operating in various locations in the State of California.  The association has kept the political, regulatory, and public policy interests of independent oil and gas producers at the forefront of its mission.

Debtor's mission, and core business purpose, is to promote greater understanding and awareness of the unique nature of California's independent oil and natural gas producers and the market place in which they operate, including the economic contributions made by California independents to local, state and national economies, and to otherwise foster the efficient utilization of California's petroleum resources and promote a balanced approach to resource development and environmental protection in order to improve business conditions for Debtor's members.

CIPA represents the diverse interests of its membership before the California State Legislature, the United States Congress, and numerous federal, state, and local regulatory agencies advocating free market principles, eliminating duplicative regulation, stimulating recovery of domestic resources, working with various other non-profit institutions to address public interest issues relating to its industry, and educating the public about industry issues.  CIPA also conducts several events throughout the year for its membership with its annual meeting being the largest annual oil and gas industry event on the west coast.

Debtor commenced a voluntary petition for relief under Chapter 11, subchapter V of the Bankruptcy Code in the Bankruptcy Court on the Petition Date.  Debtor continues to operate and manage its affairs as a debtor in possession pursuant to Bankruptcy Code § 1184.

2.    **Debtor's Legal Structure and Management**

Debtor is a California corporation incorporated pursuant to Internal Revenue Code § 501(c)(6).  The nonprofit organization is governed by a 40-member board of directors.  The board

of directors is comprised of large and small oil and natural gas producers from the L.A. Basin, San Joaquin Valley, Central Coast, and Northern California to ensure the association's policies are broad-based and reflect the interests of the state's producers as a whole. Rock Zierman is Debtor's current President and Chief Executive Officer of the association. Stephen Layton is the current Chairman of the board of directors.

A list of Debtor's current board members and officers is set forth on Exhibit 5.

### 3. Debtor's Current and Historical Financial Condition

Debtor's current financial condition is as reflected on its Monthly Operating Report for the month ended January 2022 filed with the Bankruptcy Court and attached as Exhibit 6 to the Plan Exhibits List. Debtor operates on a fiscal year that begins August 1 and ends on July 31. At the time that this Plan was filed on or about February 22, 2022, Debtor had just started the third quarter of its 2022 fiscal year.

Debtor is incorporated pursuant to Internal Revenue Code § 501(c)(6) and, as such, is not organized for the purpose of generating profits. Rather, Debtor has successfully operated its business for over 45 years with the goal of adhering to a balanced annual budget that meets the needs of its members and goals of its Business without generating significant surplus revenue. To that end, Debtor's net operating cash flows for FY 2018 through FY 2021 (excluding the PPP Loan) averaged approximately $78,000 per year, with $231,573 in FY 2021 being the highest positive net operating cash flow and ($84,607) in FY 2019 being the lowest negative net operating cash flow.

Like many businesses, by the third quarter of Debtor's FY 2020, Debtor's operations were beginning to feel the negative fiscal impacts spurred by the COVID-19 pandemic. For example, Debtor's membership dues, which comprise most of Debtor's annual revenue, declined by 8% in FY 2021 from the prior fiscal year. Likewise, the pandemic also affected participation at and support of the annual meetings and other special meetings that typically boosted Debtor's annual revenues, resulting in lower net proceeds from such events.

Despite the negative impact on revenues resulting from COVID-19, Debtor was able to continue to operate and remain solvent due to, among other things, corresponding cost cutting measures and pandemic related funding, including the PPP Loan. For example, COVID-19

dramatically impacted Debtor's spending on field services, including travel and other related expenses, from approximately $170,000 in each of FY 2018 and FY 2019, down to less than $30,000 in FY 2021. Similarly, over the past two years, Debtor has gone from eight staff members to four, which staff reduction reduced Debtor's payroll costs from approximately $1.6 million for FY 2019 to approximately $1 million expected in FY 2022. This reduction in payroll costs excludes additional savings Debtor realizes from a reduced staff, including, without limitation, reductions in insurance costs, travel, overhead, and other auxiliary costs.

### 4. Debtor's Assets

At present, Debtor's significant assets are as identified on the Liquidation Analysis attached as Exhibit 1 to the Plan Exhibits List. The following is a more detailed discussion of certain real property owned by Debtor, as well as Debtor's non-debtor subsidiaries.

### a) Debtor's Offices and Its Mortgage on Such Property

Debtor owns an approximately 4,920 square foot commercial office suite located at 1001 K Street, 6th Floor, Sacramento, California 95814, which it purchased in 2011 and from which it currently operates its business (the "Property"). The Property is a condominium unit that takes up the top floor in a six-story building that was constructed in 1948, with a recent renovation in 2008. The Property is part of the 1001 K Street West Condominium Association, to which Debtor pays monthly dues. Debtor leases, on a month-to-month basis, certain vacant office space at the Property to a number of third-parties. The monthly rent payments from such leases (collectively, "Rents") generate cash to assist in paying Debtor's mortgage obligations on the Property.

On or about November 4, 2011, FCB made a commercial construction loan to Debtor in the original principal amount of $1,212,780.00 (the "Loan"), pursuant to that certain Construction Loan Agreement dated as of November 4, 2011 (the "Loan Agreement"). As set forth more fully in the Loan Agreement, the proceeds of the Loan were intended for the improvement of the Property. On or about November 4, 2011, FCB and Debtor entered into that certain Commercial Security Agreement (the "Security Agreement"), whereby FCB was granted a security interest in the Property and Rents. The Loan is further evidenced by the following documents, both dated November 4, 2011: (i) a Promissory Note (the "Note"), which is secured by the Property and Rents; and (ii) that

certain Construction Deed of Trust recorded in the State of California, Sacramento County Recorder on about November 14, 2011 (the "<u>Deed of Trust</u>").

On or about April 25, 2019, Debtor and FCB subsequently entered into that certain Note Modification Agreement (the "<u>Refinance Agreement</u>," and together with the Loan Agreement, Security Agreement, Note and other ancillary documents executed in connection therewith, the "<u>Loan Documents</u>), in connection with the then-outstanding principal balance owed to FCB of approximately $812,000.00 (the "<u>Loan Amount</u>").  Pursuant to the Refinance Agreement, the Loan Amount was amortized over 15 years in equal monthly payments of $6,476.60 at a fixed annual interest rate of 4.95% commencing on June 1, 2019, with the last payment payable on June 1, 2034 (the "<u>Maturity Date</u>").  The Refinance Agreement further provides for a prepayment penalty of 1% of any Excess Payment made during any Billing Cycle (as those terms are defined in the Refinance Agreement), which prepayment penalty expires ninety (90) days prior to the Maturity Date unless otherwise waived by FCB.

According to FCB in its proof of claim [see Claim 8-1], as of the Petition Date, Debtor was indebted to FCB in the amount of $737,281.06 under the Loan Documents, and FCB had an appraisal done that valued the Property at $1,600,000.00.  Pursuant to the Appraisal Report, Debtor believes that the Property, if sold in an orderly process (not a forced liquidation), may be valued in the range of $1,450,000.00 to $1,700,000.00 depending on the type of sale conducted, which amounts are exclusive of any closing costs and other fees that may be payable as a result of such sale.

Debtor was current on its mortgage payments to FCB as of the Petition Date, and has remained current on its mortgage payments to FCB during the Case.  Moreover, all Rents collected postpetition have been placed in a segregated debtor-in-possession cash collateral account, and used to satisfy, in part, Debtor's postpetition mortgage payments to FCB.

Debtor is not aware of any other entity asserting a security interest in the Property or the Rents, nor does Debtor have any other creditors with security interests in any other collateral.

### a) Affiliated, Non-Debtor Subsidiaries

In 2001, CIPA established CNGPA as a wholly-owned subsidiary with its core mission to increase public awareness and to address policy issues relating to the state's natural gas resources. CNGPA's association is governed by an eleven-member board of directors. CIPA does not derive any income from CNGPA, nor has CIPA provided any funding or other distribution to CNPGA for over seven (7) years. CIPA employees provide limited administrative and accounting services to CNPGA, typically only on a quarterly basis. CNGPA is not a debtor in this case and has not filed for bankruptcy relief.

In 2018, CIPA also created IPEX that markets crude, renewable energy projects, and cap and trade compliance products for certain CIPA member companies. CIPA does not receive income from IPEX, nor has CIPA provided any funding or other distributions to IPEX. IPEX is independently run and managed, and CIPA does not provide any services or other administrative support for IPEX's business operations. IPEX is not a debtor in this case and has not filed for bankruptcy relief.

Both of these subsidiaries continue to operate and hold assets, primarily consisting of cash, in the aggregate amount of approximately $117,000. Debtor anticipates upstreaming approximately $35,000 in the aggregate from these subsidiaries in order to help fund Debtor's payments under the Plan. Debtor believes that the remaining cash on hand at each subsidiary, after upstreaming the $35,000 aggregate payment, will be sufficient to enable the subsidiaries to continue operations and remain solvent.

### 5. Debtor's Liabilities

At present, as reflected in the Schedules and in proofs of claim filed in this Case, Debtor's estimated prepetition liabilities are as follows:[3]

---

[3] The listed amounts are good faith estimates of the total amount of asserted prepetition Claims based on a review of the Schedules and proofs of claim filed in the Case, and do not include any amounts on account of potential accrued and unpaid administrative claims arising post-petition. Nothing herein shall be deemed an admission or determination as to the amount, extent, validity or existence of such Claims, and Debtor and Reorganized Debtor reserve all rights, arguments, objections and defenses with respect thereto.

| | |
|---|---|
| FCB Secured Claim [mortgage balance as of Petition Date]: | $ 737,281.06 |
| Priority Tax Claims [unpaid as of February 22, 2022]: | $ 23,771.00 |
| General Unsecured Claims [including disputed & contingent]: | $ 2,539,569.50 |

By this Plan, Debtor also will be assuming its unexpired leases and executory contracts, and expects the Cure Amounts for such assumptions to be less than $1,000 in the aggregate. The following is a more detailed discussion of two of the largest unsecured liabilities included in the above estimates.

### a) PPP Loan

On or about February 19, 2021, Debtor obtained a PPP Loan from Valley Republic Bank in the aggregate amount of $201,250.00. On or about October 14, 2021, Debtor filed an application with the SBA to have Debtor's PPP Loan forgiven, which application was approved on December 4, 2021. As such, any claim that Valley Republic Bank may have had on account of the PPP Loan shall be deemed satisfied in full and shall not be entitled to any distributions under the Plan.

### b) The Attorneys' Fee Award and Debtor's Bankruptcy Filing

Debtor's bankruptcy case was precipitated by the entry of an unexpected and exorbitant judgment entered against it in California state court comprised solely of attorney's fees and costs, totaling $2,265,996.06 (the "Attorneys' Fee Award"), statutorily awarded to a prevailing party under California's Anti-SLAPP statute. This exorbitant Attorneys' Fee Award is the largest Anti-SLAPP judgement ever awarded in California. As a not-for-profit enterprise mainly funded by its membership dues, the Attorneys' Fee Award adversely impacts Debtor's business, and as such Debtor sought bankruptcy protection to reorganize its finances and address the Attorneys' Fee Award, along with all other outstanding claims against the bankruptcy estate, to ensure the continued operations of Debtor's business and that creditors, on all levels, are treated fairly and equitably.

The Attorneys' Fee Award arose from prosecution of a cross-complaint filed by Debtor against the Judgement Creditors. By way of background, in November 2015, the Nonprofit Creditors filed the State Court Action against the City in State Court. In the State Court Action, the Nonprofit Creditors alleged that the City's permitting of certain oil drillings was in violation of environmental and civil rights laws.

Although Debtor was not a named party in the State Court Action, in furtherance of its nonprofit mission, Debtor petitioned the State Court to intervene in the State Court Action, which request was granted. The Nonprofit Creditors and the City ultimately settled their lawsuit, but to the detriment of Debtor's interests and in contravention of the State Court's order allowing Debtor to intervene. To protect its interests and enforce the State Court's order permitting Debtor's intervention, in September 2016, Debtor filed a cross-complaint against the Judgment Creditors (the "Cross-Complaint") in the State Court Action seeking declaratory and injunctive relief that, among other things, the Judgment Creditors violated Debtor's due process rights. In November 2016, the Judgment Creditors each filed an anti-SLAPP motion (together, the "Anti-SLAPP Motions") seeking to strike Debtor's Cross-Complaint against them. By statute, the party that prevails on an Anti-SLAPP motion under California law may be able to recover certain attorneys' fees and costs for the prosecution of the Anti-SLAPP motion.

Although the trial court denied both Anti-SLAPP Motions, on appeal by the Judgment Creditors, the appellate court reversed the trial court. On remand, the trial court entered an order granting the Anti-SLAPP Motions on March 11, 2021. After post-judgment briefing on attorneys' fees were filed, the trial court entered the Attorneys' Fee Award against Debtor and in favor of the Judgment Creditors pursuant to California Civil Procedures Code ("CCP") § 426.16(c)(1) as the prevailing parties on an anti-SLAPP Motion. The execution of the Attorneys' Fee Award was stayed for sixty (60) days through September 7, 2021.

As discussed in greater detail below, after obtaining an order for relief from stay from the Bankruptcy Court, Debtor filed an appeal of the Attorneys' Fee Award in State Court, which appeal is currently pending.

**B.      Significant Events During the Bankruptcy Case**

The following is a description of some of the more significant events that have happened in the Case prior to filing the Plan:

**1.      Employment of Professionals**

Following the Petition Date, Debtor sought, and obtained Bankruptcy Court approval [Dkt. No. 26], to employ Sklar Kirsh, LLP as its bankruptcy counsel. Debtor also sought, and obtained

Bankruptcy Court approval [Dkt. No. 55], to employ Arch & Beam Global, LLC as its financial advisors to assist Debtor, in among other things, evaluating and formulating a restructuring strategy that forms the basis of this Plan. In connection with valuing the Property, Debtor also retained, pursuant to an order of the Bankruptcy Court [Dkt. No. 94], Valbridge as its appraiser. In early November, Valbridge performed an appraisal of the Property and prepared the Appraisal Report.

Prior to the Petition Date and in the ordinary course of its business, Debtor utilized certain law firms to assist it in its business operations, including, without limitation, in the areas of regulatory advocacy, corporate governance and litigation. Following the Petition Date, Debtor filed applications to employ the following professionals to continue providing legal and regulatory advocacy services to Debtor: (i) on December 7, 2021, Debtor filed a motion to retain Manatt, Phelps & Phillips LLP as special counsel [Dkt. No. 132], which application was approved by the Court on December 8, 2021 [Dkt. No. 138]; (ii) on December 22, 2021, Debtor filed a motion to retain Alcorn Law Corporation as special counsel [Dkt. No. 149], which application was approved by the Court on December 28, 2021 [Dkt. No. 161]; and (iii) on December 23, 2021, Debtor filed a motion to retain Alcantar Law Group LLP as special counsel [Dkt. No. 154], which application was approved by the Court on December 28, 2021 [Dkt. No. 159].

**2.      Motion to Retain and Compensate Consultants Used in the Ordinary Course of Business**

On November 1, 2021, Debtor moved for entry of an order authorizing it to continue to retain and compensate certain lobbyists and other consultants (collectively, the "Consultants") that Debtor employs in the ordinary course of its business that are critical to Debtor's continuing and uninterrupted business operations and core mission ("OCP Motion") [Dkt. No. 83]. None of the Consultants provide services for matters directly related to Debtor's administration of the Case. Thus, although none of the Consultants are "professional persons" within the meaning of § 327 of the Bankruptcy Code, out of an abundance of caution and in order to provide full transparency in light of issues raised by the Judgment Creditors at the October 12, 2021 status conference, Debtor filed the OCP Motion seeking authority to continue to employ the Consultants in the ordinary course of business under Bankruptcy Code § 363.

On November 18, 2021, the Nonprofit Creditors filed an opposition to the OCP Motion [Dkt. No. 106], and on November 22, 2021, the U.S. Trustee filed an objection to the OCP Motion [Dkt. No. 108]. Without the benefit of having received the U.S. Trustee's objection, Debtor's reply to the Nonprofit Creditors' opposition also was filed on November 22, 2021 [Dkt. No. 109].

On November 23, 2021, the Court entered an order continuing the hearing on the OCP Motion to January 25, 2022 at 9:30 a.m. and issuing a briefing schedule on the matter [Dkt. No. 114] (the "Briefing Order"). In accordance with the Briefing Order, Debtor filed its supplemental brief and supporting evidence in further support of the OCP Motion on December 7, 2021 [Dkt. Nos. 120-29 and 131]; the Nonprofit Creditors filed a response brief on December 21, 2021 [Dkt. No. 147]; and Debtor filed a reply brief on January 4, 2022 [Dkt. No. 165].

The Bankruptcy Court approved the use of such Consultants in the ordinary course of business by an order entered on January 18, 2022 [Dkt. No. 173].

### 3. Relief from Stay Proceedings

Although the Attorneys' Fee Award did not arise in a proceeding against Debtor, and as such any appeal of the Attorneys' Fee Award was not subject to the automatic stay, out of an abundance of caution and given the unique and complex procedural history of the underlying State Court proceedings, Debtor nonetheless sought an order of the Bankruptcy Court granting relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(l) for the limited purpose of allowing Debtor to appeal the Attorneys' Fee Award. The Bankruptcy Court granted relief from stay to permit Debtor to appeal the Attorneys' Fee Award [Dkt. No. 77], and Debtor filed an appeal in State Court on or about November 3, 2021.

In addition to the pending State Court litigation, in 2015, the Center for Biological Diversity, Inc. ("CBD"), as part of a coalition of plaintiffs, filed a lawsuit against Kern County for the alleged improper adoption of an environmental impact report for a local oil and gas ordinance, entitled *King and Gardiner Farms v. Kern County*, Case No. BCV-15-101645-GP, which was later consolidated with *Kern County* Case Nos. BCV-15-101666, BCV-15-101679, BCV-21-100533, and BCV-21-100536 (collectively, the "Kern Action").

Debtor and Western States Petroleum Association ("WSPA") were named as real parties in interest in the Kern Action as the applicants of the project at issue. However, all relief being sought in the Kern Action is directed at Kern County; no substantive relief is being sought from Debtor. Accordingly, Debtor and CBD entered into a stipulation to lift the automatic stay provisions of Bankruptcy Code § 362 as to all parties to the Kern Action for the purpose of continued prosecution of the Kern Action only. The Bankruptcy entered an order approving the stipulation for relief from the stay on November 3, 2021 [Dkt. No. 95].

## IV.

## SUMMARY OF THE PLAN OF REORGANIZATION

### A.    **What Creditors Will Receive Under the Proposed Plan**

As required by the Bankruptcy Code, the Plan classifies Claims and Interests in various classes according to their right to priority. The Plan states whether each class of Claims is Impaired or Unimpaired. The Plan provides the treatment each class will receive. The Plan will be funded by the following sources and in the order of priority specified herein: (1) the cash Debtor accumulated prior to the bankruptcy filing and on hand in Debtors possession on the Effective Date, estimated at approximately $372,000; (ii) net operating revenues from the on-going operations of Debtor's Business that will allow Debtor to make Periodic Distributions to Holders of Allowed Claims in accordance with the Payment Distribution Schedule; and/or (iii) proceeds from finance arrangements Debtor obtains after the Effective Date that allows Debtor to make a Remaining Lump Sum Payment to Holders of Allowed Claims in lieu of Periodic Distributions.

### B.    **Unclassified Claims**

Certain types of claims are not placed into voting classes; instead, they are unclassified. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and they are not considered Impaired, and they do not vote on the Plan because they are automatically entitled to specific treatment provided in the Bankruptcy Code. As a result, Debtor has not placed the following claims in a class:

### 1.    Administrative Claims

Administrative Claims include any cost or expense of administration allowed against Debtor under § 503(b) of the Bankruptcy Code. Debtor must pay all Administrative Claims in full. If an Administrative Claim is Disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Claim, or in other words, "allow" the Administrative Claim. Any Administrative Claim that is undisputed and is due and owing on the Effective Date must be paid in accordance with this Plan, or upon such other terms as agreed upon by Debtor and the Holder of such Administrative Claim or by order of the Bankruptcy Court. If the Administrative Claim is disputed, payment will be made only after the Administrative Claim is allowed by the Bankruptcy Court.

On, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of such Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim. Notwithstanding the foregoing, (y) any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Bankruptcy Case may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (z) any Allowed Administrative Claim may be paid on such other terms as may be agreed to between the Holder of such Claim and Debtor or the Reorganized Debtor.

Debtor here has two general types of Administrative Claims that may arise in the Case: the "Ordinary Course of Business Administrative Claims" and the "Professional Administrative Claims."

- "Ordinary Course of Business Administrative Claims": Because Debtor continued to operate post-petition, creditors that continued to do business with Debtor and provide goods or services to Debtor in the ordinary course of business are entitled to be paid in full for the goods or services provided post-petition. This ordinary course of business debt incurred by Debtor after the Petition Date will be paid on an ongoing basis as

incurred in accordance with the ordinary business practices and terms between Debtor and its creditors, and as such Debtor believes that the amount of accrued but unpaid Ordinary Course Business Administrative Claims as of the Effective Date will be zero.

- "<u>Professional Administrative Claims</u>":  Administrative Claims also include any post-petition fees and expenses of Professionals, including the Allowed Claim of Debtor's attorneys and financial advisors employed upon Bankruptcy Court authority to render services to Debtor during the course of the Case.  These fees and expenses must be noticed to creditors and approved by the Bankruptcy Court prior to payment.  The following is a list of estimated Professional Administrative Claims that have accrued or will accrue from the Petition Date through the Effective Date that Debtor anticipates satisfying as part of the Plan, subject to any required applications and further Bankruptcy Court Orders.

| *Holder* | *Estimated Allowed Claim* | *Basis of Claim* |
|---|---|---|
| Subchapter V Trustee | $20,000 | Professional Fees |
| Sklar Kirsh, LLP | $450,000 | Professional Fees (General Bankruptcy Counsel) |
| Office of the UST | $0 | No UST fees are required in a Subchapter V |
| Arch + Beam | $95,000 | Professional Fees (Financial Advisors) |
| Special Counsel Retained Under § 327(e) (Manatt, Phelps & Philips, LLC; Alcantar Law Group; and Alcorn Law Corporation | $251,000 | Professional Fees (§ 327(e) Special Counsel) |

Notwithstanding the foregoing proposed treatment for Administrative Claims generally, the Bankruptcy Court must rule on all Professional fees listed in the above chart before the fees will be allowed. For all fees, the Professional in question must file and serve a properly noticed fee application and the Bankruptcy Court must rule on the application. Only the amount of fees allowed by the Bankruptcy Court will be owed and required to be paid under this Plan. The

amounts set forth above are estimates made by the respective Professionals of the approximate amount which will be due after the application of any retainer.

On the Effective Date, approximately $367,223 shall be reserved in Debtor's account for payment of all Allowed Professional Administrative Claims.[4] In the event the Allowed Professional Administrative Claims exceed the aforementioned reserved amount, the Periodic Distributions or Remaining Lump Sum Payment, as applicable, shall first be disbursed to the Professionals before any distributions or reserves are made on account of any other Class, and such amount will be divided pro-rata on account of each Allowed Professional Administrative Claim until such Allowed Professional Administrative Claims are paid in full, without interest.

Following the Effective Date, the Reorganized Debtor shall be entitled to employ such professionals (including any of the Professionals) that the Reorganized Debtor deems appropriate and to pay the fees and expenses incurred by such professionals in the ordinary course of the Reorganized Debtor's Business without any further order of the Bankruptcy Court.

### 2. Priority Tax Claims

Priority Tax Claims include certain unsecured income, employment and other taxes described by Bankruptcy Code § 507(a)(8). The Bankruptcy Code requires that each Holder of such Priority Tax Claim receive regular installment payments of such claim in deferred cash payments, over a period not exceeding five years from the Petition Date, in a manner not less favorable than the most favored nonpriority General Unsecured Claim provided for by the Plan (other than cash payments made to a class of creditors under § 1122(b)). Although the Bar Date for government entities to file Claims is March 4, 2022, as of the date this Plan was filed, the only Priority Tax Claims either scheduled and/or filed were as follows:

---

[4] In the event that the Court approves any fee applications of the Professionals prior to the Effective Date, the amount reserved as of the Effective Date for payment of such Professionals may be reduced by any payments actually made to such Professionals prior to the Effective Date in accordance with any applicable orders of the Court.

| Holder | Claim Amount | Basis of Claim and Status |
|---|---|---|
| Internal Revenue Service | $23,711.00 | Scheduled by Debtor relating to Deferred Payroll Tax Payments pursuant to the CARES Act |
| Internal Revenue Service | $38,000.00 | Proof of Claim No. 1 for Estimated Tax Payment, which has been satisfied in full |
| Sacramento County Tax Collector | $25,000 | Scheduled by Debtor relating to property taxes, which have been satisfied in full |

Debtor believes that the Priority Tax Claims have been satisfied, either in part or in full, as such claims have been incurred during this Case, with the exception of the deferred payroll tax obligation of approximately $23,771.00 referenced above.

Except to the extent that the Holder of an Allowed Priority Tax Claim has agreed to a less favorable treatment of such Claim, on, or as soon as reasonably practicable after the latest of (a) the Effective Date, (b) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, (c) the date on which such Allowed Priority Tax Claim is otherwise due and payable, and (d) such other date as mutually may be agreed to by and between Debtor and the Holder of such Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, Cash equal to the unpaid portion of such Allowed Priority Tax Claim.

**C.**      **Classified Claims and Interests**

Pursuant to Bankruptcy Code § 1122, set forth below is a designation of Classes of Claims against Debtor. A Claim is placed in a particular Class only to the extent that the Claim falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim in that Class, and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

| *Class* | *Claim or Interest* | *Impaired/Unimpaired* | *Entitled to Vote on Plan* |
|---------|---------------------|------------------------|----------------------------|
| 1 | FCB Secured Claim | Unimpaired | NO |
| 2 | Priority Unsecured Claims | Unimpaired | NO |
| 3 | General Unsecured Claims | Impaired | YES |

### 1.     Class of Secured Claims (Class 1)

Secured claims are claims secured by liens on property of the Estate. The following chart lists the Class of creditors who hold secured pre-petition claims and the treatment of such Class under the Plan:

| *Holder* | *Description and Treatment of Secured Claim* |
|----------|-----------------------------------------------|
| Class 1:  FCB | On the Effective Date, FCB shall have an allowed secured claim equal to the amount of principal and non-default interest, owed on the Effective Date (the "FCB Secured Claim").  The FCB Secured Claim arises from and relates to the Loan Documents.  The FCB Secured Claim shall accrue interest after the Effective Date as set forth in the Refinance Agreement, and be paid pursuant to the terms and conditions of the Refinance Agreement. |
| | The Reorganized Debtor shall make monthly loan payments in the amount of $6,476.60, as set forth in the Refinance Agreement, and the FCB Secured Claim shall mature as set forth in the Refinance Agreement. |
| | Except as provided in this section, and notwithstanding § 114l(c) or any other provision of the Bankruptcy Code, all valid, enforceable and perfected prepetition liens of FCB shall survive the Effective Date and continue in accordance with the contractual terms of the underlying Loan Documents until the FCB Secured Claim is satisfied pursuant to the Plan. |
| | The Reorganized Debtor reserves the right and option of prepaying all or any part of the principal, accrued interest, or other charges, without penalty or fees except for the prepayment penalty expressly provided for in the Loan Documents, through a refinance transaction of the Property prior to substantial consummation of the Plan. |

**2.       Class 2:  Class of Priority Unsecured Claims**

Certain priority claims that are referred to in Bankruptcy Code § 507(a) are required to be placed in Classes.  No Priority Unsecured Claims were scheduled by Debtor or filed against Debtor, and Debtor believes that any such claims have been satisfied in full.

Although no Priority Unsecured Claims have been filed, and Debtor is not aware of any such claims, if any Priority Unsecured Claims are Allowed, such claims will be satisfied under the Plan as follows:  except to the extent that the Holder of an Allowed Priority Unsecured Claim has agreed to a less favorable treatment of such Claim, on, or as soon as reasonably practicable after the latest of (a) the Effective Date, (b) the date on which such Priority Unsecured Claim becomes an Allowed Priority Unsecured Claim, (c) the date on which such Allowed Priority Unsecured Claim is otherwise due and payable, and (d) such other date as mutually may be agreed to by and between Debtor and the Holder of such Priority Unsecured Claim, each Holder of an Allowed Priority Unsecured Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Priority Unsecured Claim, Cash equal to the unpaid portion of such Allowed Priority Unsecured Claim.

**3.       Class 3: Classes of General Unsecured Claims**

General Unsecured Claims are unsecured Claims not entitled to priority under Bankruptcy Code § 507(a).  Under the Plan, all Class 3 Claims may be disputed by Debtor in accordance with the procedures set forth in the Plan.  The following identifies Class 3 Claims that may be entitled to vote and/or receive distributions under the Plan, together with the asserted amount of each potential Claim and/or whether such Claim currently is an Allowed Claim or Disputed Claim.

| Unsecured Creditor | Allowed Claim | Disputed Claim | Proposed Treatment Under Plan |
|---|---|---|---|
| Alcantar Law Group | $900.00 | | Paid pro-rata share of distributions on account of Class 3 Claim |
| Alcorn Law Corporation | $340.00 | | Paid pro-rata share of distributions on account of Class 3 Claim |
| Alston & Bird LLP | $68,072.84 | | Paid pro-rata share of distributions on account of Class 3 Claim |
| Californians for Energy Independence | $100,000.00 | | Paid pro-rata share of distributions on account of Class 3 Claim |

| | | | |
|---|---|---|---|
| First Citizens Bank | $1,144.10 | | Paid pro-rata share of distributions on account of Class 3 Claim |
| Manatt, Phelps & Philips, LLC | $101,791.50 | | Paid pro-rata share of distributions on account of Class 3 Claim |
| Hilton Long Beach | $1,000.00 | | Paid pro-rata share of distributions on account of Class 3 Claim |
| Littler Mendelson, PC | $325.00 | | Paid pro-rata share of distributions on account of Class 3 Claim |
| Center For Biological Diversity | | $1,233,246.06 | The pro-rata share of distributions for one $1,233,246.06 claim held jointly by the Nonprofit Creditors will be held in reserve by Disbursing Agent until such Disputed Claim is Allowed |
| City of Los Angeles | | $1,032,750.00 | Pro-rata share of distributions held in reserve by Disbursing Agent until Disputed Claim is Allowed |
| South Central Youth Leadership Coalition | | $1,233,246.06 | The pro-rata share of distributions for one $1,233,246.06 claim held jointly by the Nonprofit Creditors will be held in reserve by Disbursing Agent until such Disputed Claim is Allowed |
| Youth for Environmental Justice | | $1,233,246.06 | The pro-rata share of distributions for one $1,233,246.06 claim held jointly by the Nonprofit Creditors will be held in reserve by Disbursing Agent until such Disputed Claim is Allowed |

Except to the extent that the Holder of an Allowed General Unsecured Claim has agreed to a less favorable treatment of such Claim, Allowed General Unsecured Claims shall receive a pro rata share of the payments set forth in the Payment Distribution Schedule for Holders of Allowed General Unsecured Claims, which payment is no more than $500,000 of the Total Plan Payment amount payable in Periodic Distributions on a pro rata basis per the Payment Distribution Schedule over a sixty (60) month period, or an amount as set forth in the Payment Distribution Schedule not less than $382,000 payable on such earlier date at Debtor's election as a Remaining Lump Sum Payment. For clarity purposes, the Total Plan Payment (and any Periodic Distributions or Remaining Lump Sum Payment made in satisfaction thereof) shall not include any interest. The portion of the Total Plan Payment payable on account of Allowed General Unsecured Claims shall be made in such amounts and on such dates (or as soon as reasonably practicable thereafter) as set forth in the Payment Distribution Schedule.

Debtor shall pay each of the Periodic Distributions to each Holder of Allowed General Unsecured Claims in Cash equal to its pro rata distribution of the Periodic Distribution on the latest of (a) as soon as reasonably practicable after the date set forth in the Payment Distribution Schedule for such payment, (b) the date on which such Disputed General Unsecured Claim becomes an Allowed General Unsecured Claim, and (c) such other date as mutually may be agreed to by and between Debtor and the Holder of such Allowed General Unsecured Claim.

The estimated percentage recovery to Holders of Allowed General Unsecured Claims in Class 3 is estimated to be between 14% to 20%, based upon all of the General Unsecured Claims identified above, including both Allowed Claims and Disputed Claims, and depending on whether Periodic Distributions are made over the full 5 year period or earlier through a Remaining Lump Sum Payment. The anticipated percentage recovery on account of General Unsecured Claims may be further adjusted and subject to change based on the determination or reconciliation of objections, including any Final Order entered with respect to the State Court Action and the pending appeal of the Attorneys' Fee Award.

**D.　Reservation of Rights with Respect to Claims**

Except as otherwise provided in this Plan, nothing shall affect Debtor's or the Reorganized Debtor's rights and defenses, both legal and equitable, with respect to any Claims or the right to object to any Claim, including all rights with respect to legal and equitable defenses to setoffs against or recoupments of Claims, including Claims in Unimpaired Classes.

**V.**

**MEANS OF EFFECTUATING THE PLAN**

**A.　Funding for the Plan**

The Total Plan Payment will be funded by the following sources: (i) cash on hand Debtor has accumulated as of the Effective Date, which is estimated in the amount of approximately $372,000; (ii) net operating revenues from the on-going operations of Debtor's Business that will allow Debtor to make Periodic Distributions to Holders of Allowed Claims in accordance with the Payment Distribution Schedule; and/or (iii) proceeds from finance arrangements Debtor obtains after the Effective Date that allows Debtor to make a Remaining Lump Sum Payment to Holders of

Allowed Claims in lieu of Periodic Distributions.  In support of the Total Plan Payment, Debtor has provided: (i) projected financial information in the Plan Payment Projections attached as <u>Exhibit 2</u> to the Plan Exhibits List; (ii) the Payment Distribution Schedule attached as <u>Exhibit 3</u> to the Plan Exhibits List; and (iii) historical financial information attached as <u>Exhibit 7</u> to the Plan Exhibits List, as well as the Appraisal Report attached as <u>Exhibit 4</u> to the Plan Exhibits List, both supporting the feasibility of the Plan Payment Projections and Payment Distribution Schedule.

As of the Petition Date and as reported on the Schedules, Debtor reported assets with a value of approximately $2 million and liabilities (including contingent, unliquidated and disputed liabilities) of approximately $3.68 million. As discussed in greater detail above, prior to the Attorneys' Fee Award, Debtor was solvent and successfully operated its business for over 45 years. Debtor's profit and loss statements in the past four fiscal years preceding the Petition Date shows Debtor's net operating cash flows for FY 2018 through FY 2021 (excluding the PPP Loan) averaged approximately $78,000 per year, with $231,573 in FY 2021 being the highest positive net operating cash flow and ($84,607) in FY 2019 being the lowest negative net operating cash flow.

Like many businesses, by the third quarter of Debtor's FY 2020, Debtor's operations were beginning to feel the negative fiscal impacts spurred by the COVID-19 pandemic.  For example, Debtor's membership dues, which comprise most of Debtor's annual revenue, declined by 8% in FY 2021 from the prior fiscal year.  Likewise, the pandemic also affected participation at and support of the annual meetings and other special meetings that typically boosted Debtor's annual revenues, resulting in lower net proceeds from such events.

Despite the negative impact on revenues resulting from COVID-19, Debtor was able to continue to operate and remain solvent due to, among other things, corresponding cost cutting measures and pandemic related funding, including the PPP Loan.  For example, COVID-19 dramatically impacted Debtor's spending on field services, including travel and other related expenses, from approximately $170,000 in each of FY 2018 and FY 2019, down to less than $30,000 in FY 2021.  Similarly, over the past two years, Debtor has gone from eight staff members to four, which staff reduction reduced Debtor's payroll costs from approximately $1.6 million for FY 2019 to approximately $1 million expected in FY 2022.  This reduction in payroll costs excludes

1    additional savings Debtor realizes from a reduced staff, including, without limitation, reductions in

2    insurance costs, travel, overhead, and other auxiliary costs.

3         The Plan Payment Projections take into account Debtor's pre-pandemic historical

4    performance, as well as the more recent decline in both revenues and costs resulting from the post-

5    pandemic economy. The Plan Payment Projections further contemplate that Debtor will have

6    approximately $372,000 of cash on hand on the Effective Date. With the resolution of certain debt

7    obligations and the continued implementation of cost saving measures, Debtor is optimistic that it

8    will operate under conditions that, although not as robust as the FY 2018/2019 pre-pandemic time

9    period, provide a modest bump in revenues and spending by FY 2023, with a projected slower, but

10   upward, growth thereafter. Debtor's current cash holdings, together with the projected net income

11   from the on-going business operations, provide for the Total Cash Payment to Holders of Allowed

12   Claims over time and take Debtor through the Plan.

13        Debtor also plans to explore alternative financing opportunities, either through a refinance

14   of the Property and/or obtaining an unsecured loan, that will enable it to make a Remaining Lump

15   Sum Payment to Holders of Allowed Claims in lieu of all or some of the Periodic Distributions,

16   which facilitate Debtor's ability to substantially consummate the Plan earlier than the sixty (60)

17   months set forth in the Plan Payment Projections.

18        **B.      Post-Confirmation Management**

19        The post-confirmation management of the Reorganized Debtor shall remain the same as

20   Debtor's pre-confirmation management. On the Effective Date, the Reorganized Debtor will

21   continue to be managed in the same manner and by the same board of directors, chairman, chief

22   executive officer and other executive committee members as it is currently managed and in

23   accordance with its applicable operating agreement. Rock Zierman shall continue to serve as the

24   Chief Executive Officer of the Reorganized Debtor following confirmation, and Stephen Layton

25   shall continue to serve as the Chairman of the board of directors. All other members and positions

26   on the board of directors and the executive committee, as set forth on Exhibit 5, shall remain the

27   same following the Effective Date.

28

On the Effective Date, all such fiduciaries will be deemed to have been appointed automatically without any requirement of further action by members, creditors, directors, or managers of Debtor or the Reorganized Debtor. Each of the matters provided for under this Plan involving the corporate structure of Debtor or the Reorganized Debtor or any corporate action to be taken by, or required of, Debtor or the Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by members, creditors, directors, or managers of Debtor or the Reorganized Debtor. Each of Debtor and the Reorganized Debtor, and their respective officers and designees, is authorized to execute, deliver, file, or record all contracts, instruments, releases, indentures, and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, or to otherwise comply with applicable law.

C.  **Investigation and Prosecution of Claims and Causes of Action Including Avoidance Actions**

Debtor or the Reorganized Debtor, as the case may be, may (but are not obligated to) investigate all claims and causes of action, including, but not limited to, any claims or causes of action under any of Bankruptcy Code §§ 544, 546, 547, 548, 550, 551 and 552, or of Debtor and this Estate and determine which, if any, should be prosecuted. All such claims and causes of action of Debtor and its Estate are preserved by the Plan unless otherwise indicated, and the Reorganized Debtor shall have the full power and authority to file, prosecute, settle, adjust, retain, enforce or abandon any such claim or cause of action as the representative of Debtor's Estate under Bankruptcy Code § 1123(b) or otherwise, whether such claims and causes of action were commenced by Debtor prior to the Effective Date or by the Reorganized Debtor after the Effective Date.

Nothing contained in the Plan shall constitute a waiver or release by Debtor or the Reorganized Debtor of any rights or of any defenses Debtor or the Reorganized Debtor may have with respect to any such claims and causes of action. Based upon Debtor's preliminary investigation, Debtor does not anticipate filing any avoidance actions. Although Debtor

reserves all rights to later fully investigate and pursue any avoidance actions, Debtor does not intend to do so prior to Confirmation.

**D.    Disbursing Agent and Post-Confirmation Services of the Subchapter V Trustee**

The Reorganized Debtor will act as the Disbursing Agent, and all payments to Holders of Allowed Claims required by the Plan will be made directly from the Reorganized Debtor.  Payment will be by bank check, business check, wire transfer, or bank-to-bank systems such as Zelle or "bill pay," or any other method that may be agreed between the Reorganized Debtor and any specific creditor, which is designed to quickly, accurately, and inexpensively disburse the funds to creditors under the Plan.  Regardless of whether the Plan is confirmed under Bankruptcy Code § 1191(a) (consensual) or §1191(b) (non-consensual), the Subchapter V Trustee's duties terminate with substantial consummation of the Plan.

**E.    Objections to Claims**

Pursuant to Bankruptcy Code § 502(a), any party in interest may assert objections to claims.  Objections to claims shall be filed no later than 45 days after the date of entry of the Confirmation Order confirming the Plan, unless the deadline to file such claim is after the Confirmation Date, in which case the deadline shall be no later than forty-five (45) days after such claim has been filed with the Bankruptcy Court, or as such deadlines may be extended by the Bankruptcy Court.  As provided by Bankruptcy Code § 502(c), the Bankruptcy Court may estimate any contingent or unliquidated Disputed Claim for purposes of confirmation of the Plan.  The Bankruptcy Court shall retain jurisdiction over Debtor, the Reorganized Debtor and the Case to resolve such objections to claims following the confirmation of the Plan.

Nothing contained in the Plan shall constitute a waiver or release by Debtor of any rights of setoff or recoupment, or of any defense, it may have with respect to any claim.  The Disbursing Agent will withhold from property to be distributed under the Plan and will place in reserve a sufficient amount of cash to be distributed on account of Disputed Claims that have not been allowed as of the date of distribution to creditors of any particular class as if such claims were

allowed in full; provided, however, that such reserve shall not be required for Disputed Claims that are Disallowed under this Plan.

**F.**   **Interest Pending Allowance of Claims**

Except as specifically provided for in the Plan with respect to the FCB Secured Claim, in the order confirming the Plan, or in some other order of the Bankruptcy Court, interest shall not accrue on Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. To the extent Debtor or any other party in interest objects to the allowance of any Claim, nothing in the Plan or herein shall be deemed to imply or create for the holders of any Disputed Claims any entitlement to receive interest upon the allowed amount of any such Disputed Claims as a result, *inter alia,* of the delay in payment of such Claims, except as expressly stated in the treatment pursuant to the Plan.

**G.**   **Distribution to be Made Pursuant to the Plan**

Distributions to be made by Debtor or the Reorganized Debtor on any particular date on account of any claim shall be made on such date or as promptly thereafter as practicable. Distributions to be made under the Plan shall be in U.S. currency and shall be made, at the sole election of the Disbursing Agent, by bank check, business check, wire transfer, or bank-to-bank systems such as Zelle or "bill pay," or any other method that may be agreed between Debtor and any specific creditor, which is designed to quickly, accurately, and inexpensively disburse the funds to creditors under the Plan.

Except as otherwise agreed to by the Disbursing Agent in writing, distributions to be made to Holders of Allowed Claims pursuant to the Plan may be delivered by regular mail, postage prepaid, to the address shown in Debtor's schedules, as they may from time to time be amended in accordance with Bankruptcy Rule 1009, or, if a different address is stated in a proof of claim duly filed with the Bankruptcy Court, to such address.

Checks issued by the Disbursing Agent to pay Allowed Claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Reorganized Debtor by the holder of the Allowed Claim to whom such check originally was issued, prior to the expiration of ninety (90) days from the date

of issuance of such check. After such date, the claim shall be deemed Disallowed and the monies otherwise payable on account of such claim shall revest in the Reorganized Debtor free and clear of all claims and interest.

In connection with the Plan and any instruments issued in connection therewith, the Reorganized Debtor shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

**H.     Exculpations and Releases**

To the maximum extent permitted by law, none of Debtor, the Estate, nor any of its employees, agents, members, directors, representatives, or the professionals employed or retained by any of them, whether or not by Bankruptcy Court order (each, a "Released Person"), shall have or incur liability to any person or entity for an act taken or omission made in good faith, and not those rising to the level of willful misconduct or gross negligence, in connection with or related to the formulation of the Plan, the Plan, or a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of the Plan, or the consummation and implementation of the Plan and the transactions contemplated therein that occurred in relation to the Plan approval process during the Case. Each Released Person shall in all respects be entitled to reasonably rely on the advice of counsel with respect to its duties and responsibilities under the Plan.

**I.     Injunctions**

The occurrence of the Effective Date after the entry of the Confirmation Order shall enjoin the prosecution, whether directly, derivatively or otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest released, discharged or terminated pursuant to the Plan.

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all entities that have held, currently hold or may hold a claim or other debt or liability that is discharged or an interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are enjoined from taking any of the following actions against Debtor and

the Estate for collection of any portion of their claim or their property on account of any such discharged claims, debts or liabilities or terminated interests or rights so long as Debtor complies with the terms of the Plan: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to Debtor; (v) commencing or continuing any action in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

### J. Risk Factors

The proposed Plan has the following risk: Debtor believes that risks to payment herein are de minimis as it anticipates that it will have sufficient funds from existing cash on hand as of the Effective Date and operations following the Effective Date to make the Total Plan Payment as required under the Plan in accordance with the Plan Payment Projections and the Payment Distribution Schedule. In addition, in the event that Debtor's operations are insufficient to generate the Total Plan Payment, the combination of cash generated through operations and the equity value of the Property is sufficient to ensure that Debtor can meet the Total Plan Payment obligation under the Plan. Nothing herein shall be deemed to waive Debtor's or the Reorganized Debtor's ability to tender the Remaining Lump Sum Payment in full and complete satisfaction of the Total Plan Payment on account of Holders of Allowed Claims, including those holding Class 3 Claims, at any time in the Reorganized Debtor's sole discretion, and the Plan shall be considered substantially consummated upon payment of the Remaining Lump Sum Payment.

### K. Executory Contracts and Unexpired Leases

#### 1. Assumptions

The leases and contracts identified on Exhibit 8 (collectively, the "Assumed Contracts")[5]

---

[5] Nothing herein shall be deemed an admission or determination that any of the Assumed Contracts, or any other leases and/or contracts that may be rejected pursuant to Article V.K.2 below, are executory or are not otherwise terminated or expired by their own terms, and Debtor and the Reorganized Debtor reserve all rights, arguments and defenses with respect thereto.

shall be assumed as obligations of the Reorganized Debtor under the Plan. Assumption means that Debtor has elected to continue to perform the obligations under such Assumed Contracts. Debtor believes that such Assumed Contracts are current and therefore no cure amounts are due, other than the two Assumed Contracts identified on Exhibit 8 with aggregate Cure Amounts totaling less than $1,000.00. To the extent that any of the counter-parties to the Assumed Contracts are listed on the Schedules with a claim amount (whether or not listed as contingent, liquidated or disputed) or have otherwise filed a proof of claim in the Case, such Scheduled or filed claims shall be deemed satisfied in full by the treatment provided in this Section K.1 and payment of the Cure Amount, if any, on the Effective Date.

The Confirmation Order shall constitute an order approving the assumption of Debtor's Assumed Contracts. Debtor may amend Exhibit 8 prior to the Confirmation Hearing to remove and/or add executory contracts and unexpired leases to be assumed under the Plan on at least 14 days' notice to counter-parties to such agreements prior to the hearing on Confirmation Hearing.

ANY OBJECTION TO THE PROPOSED ASSUMPTION, INCLUDING THE PROPOSED CURE AMOUNT AND ADEQUATE ASSURANCE OF FUTURE PERFORMANCE, OF ANY OF THE ASSUMED CONTRACTS shall be filed by the Plan Objection Deadline; provided, however, that if Exhibit 8 is amended to add or remove an unexpired lease or executory contract 14 days prior to the Plan Objection Deadline or later, then any counter-party affected by such amendment shall have until 7 days prior to the Confirmation Hearing to file and serve such objection. In the event of such objection, the Reorganized Debtor shall not be obligated to make any distribution in respect of such Claim until such dispute is resolved by Final Order of the Bankruptcy Court or the agreement of the parties.

### 2. Rejections

Any unexpired lease or executory contract that is not designated as an Assumed Contract shall be deemed rejected as of the Confirmation Date (the "Rejected Contracts"). The Confirmation Order shall constitute an order approving the rejection of each of the Rejected Contracts.

THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE OR CONTRACT shall be 30 days after entry

of the Confirmation Order approving such rejection, subject to the Reorganized Debtor's right to object thereto. In the event of such objection, the Reorganized Debtor shall not be obligated to make any distribution in respect of such Claim until such dispute is resolved by Final Order of the Bankruptcy Court or the agreement of the parties. Any Claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Bankruptcy Court later orders otherwise.

**L.**       **Retention of Jurisdiction**

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction (unless otherwise indicated) over all matters arising out of, and related to, the Reorganization Case and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)       resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease with respect to which Debtor or the Reorganized Debtor may be liable, and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(b)       decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications, involving Debtor that may be pending on the Effective Date;

(c)       decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications, involving objections to Claims filed after the Effective Date;

(d)       enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan or the Confirmation Order;

(e)       resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to this Plan, or any entity's rights arising from, or obligations incurred in connection with, this Plan or such documents;

(f)       modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan or the Confirmation Order, or remedy any defect or omission, or reconcile any inconsistency, in any Bankruptcy Court order, this Plan, the Confirmation Order, or any contract, instrument,

release, or other agreement or document created in connection with this Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

(g)     hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 503(b) and 1129(a)(4) of the Bankruptcy Code; provided, however, that from and after the Effective Date the payment of fees and expenses of the Reorganized Debtor, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(h)     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of this Plan or the Confirmation Order;

(i)     adjudicate controversies arising out of the administration of the Estate or the implementation of this Plan;

(j)     recover all assets of Debtor and property of the Estate, wherever located;

(k)     hear and determine causes of action by or on behalf of Debtor or the Reorganized Debtor;

(l)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason, or in any respect, modified, stayed, reversed, revoked, or vacated, or distributions pursuant to this Plan are enjoined or stayed;

(m)     hear and resolve all matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(n)     determine any other matters that may arise in connection with, or relate to, this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan or the Confirmation Order;

(o)     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Bankruptcy Case;

(p)     hear and determine such other matters related hereto that are not inconsistent with the Bankruptcy Code or title 28 of the United States Code; and

(q)     enter an order closing the Bankruptcy Case.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth above, the provisions of this Article shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

# VI.

## CONFIRMATION REQUIREMENTS AND PROCEDURES

The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

**PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.**

Many requirements must be met before the Bankruptcy Court can confirm a Plan. Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible. These requirements are <u>not</u> the only requirements for confirmation.

### A.  <u>Who May Vote or Object</u>

#### 1.  **Who May Object to Confirmation of the Plan**

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

#### 2.  **Who May Vote to Accept/Reject the Plan**

A creditor has a right to vote for or against the Plan if that creditor has a Claim which is both (a) Allowed or Allowed for voting purposes; and (b) classified in an Impaired Class.

##### a)  *What Is an Allowed Claim*

As noted above, a creditor must first have an Allowed Claim to have the right to vote. Generally, a proof of claim will be allowed, unless a party in interest brings a motion objecting to the claim. When an objection to a claim is filed, the creditor holding the claim or interest cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.  THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE WAS NOVEMBER 15, 2020 FOR NON-GOVERNMENT ENTITIES.

A creditor may have an allowed claim even if a proof of claim was not timely filed. A claim is deemed allowed if (1) it is scheduled on Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.

Debtor or any party in interest shall file with the Bankruptcy Court its written objections, if any, to any proof of claim no later than the thirty (30) days following the Confirmation Date , unless the deadline to file such claim is after the Confirmation Date, in which case the deadline shall be no later than thirty (30) days after such proof of claim has been filed with the Bankruptcy Court, or as such deadlines may be extended by the Bankruptcy Court, and cause the hearings on those objections to be convened on the first available dates which are convenient to the Bankruptcy Court. If such objections are not timely filed as provided herein, then the Disputed Claims in question will be deemed Allowed. Notwithstanding the foregoing, with respect to any Disputed Claim that is a Claim (i) scheduled by Debtor as contingent, unliquidated, or disputed for which the Holder of such Claim did not timely file a proof of claim, or (2) claimed in a proof of claim as zero or undetermined, such Disputed Claim shall <u>not</u> be entitled to vote and shall <u>not</u> be entitled to any distributions under this Plan, and shall be deemed Disallowed.

The foregoing objection deadlines and procedures do not apply to the Judgment Creditors' claims, which are Disputed Claims arising from the Attorneys' Fees Award currently on appeal in the State Court Action. Whether and in what amount the Judgment Creditors' claims shall be deemed Allowed is subject to a final, non-appealable order of the Bankruptcy Court allowing such claims upon motion of Debtor, the Reorganized Debtor and/or the Judgment Creditors seeking such allowance after settlement of the pending appeal or entry of a final, non-appealable order determining the validity and/or amount of the Attorneys' Fee Award in the State Court Action.

### b)      What Is an Impaired Claim

As noted above, an Allowed Claim only has the right to vote if it is in a class that is Impaired under the Plan. A class is Impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is Impaired if the Plan fails to pay the members of that class 100% plus interest of what they are owed. In this Case, Debtor believes that Holders of Claims in Class 3 under the Plan are Impaired, and that as a result

can vote on the Plan. For reasons stated below, members of Classes 1 and 2 are not entitled to vote on the Plan. Parties who dispute Debtor's characterization of its claim or interest as being Impaired or Unimpaired may file an objection to the Plan contending that Debtor has incorrectly characterized the class.

### c) *Who Is Not Entitled to Vote*

The following four types of claims are not entitled to vote: (1) claims that have been Disallowed; (2) claims in Unimpaired Classes; (3) claims entitled to priority pursuant to Bankruptcy Code §§ 507(a)(1), (a)(2), (a)(4) and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan. Claims in Unimpaired Classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code §§ 507(a)(l), (a)(2), and (a)(8) are not entitled to vote because such claims are not placed in classes, and they are required to receive certain treatment specified by the Bankruptcy Code.

Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. **EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.**

### 3. **Who Can Vote in More Than One Class**

A creditor whose claim has been allowed in part as a Secured Claim and in part as a General Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim (to the extent that such secured part of the claim is Impaired and entitled to vote) and another ballot for the General Unsecured Claim.

### 4. **Votes Necessary to Confirm the Plan**

If Impaired classes exist, the Bankruptcy Court cannot confirm the Plan unless (1) at least one Impaired Class has accepted the Plan without counting the votes of any insiders within that Class, and (2) all Impaired Classes have voted to accept the Plan. If the vote is insufficient, the Bankruptcy Court can still confirm the Plan, but only if certain additional elements are shown including that the Plan does not discriminate unfairly, and is fair and equitable, with respect to

each Class of Claims that is Impaired under, and has not accepted, the Plan. See 11 U.S.C. § 1191(b).

       *a)*     *Votes Necessary for a Class to Accept the Plan*

A class of claims is considered to have accepted the Plan when more than one-half (1½) in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted, voted in favor of the Plan.

       *b)*     *Treatment of Non-accepting Classes*

As noted above, even if all Impaired classes do not accept the proposed Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code. The process by which non-accepting classes are forced to be bound by the terms of a Plan if the vote is insufficient, the Bankruptcy Court can still confirm the Plan, but only if certain additional elements are shown including that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each Class of Claims that is Impaired under, and has not accepted, the Plan. See 11 U.S.C. § 1191(b). Debtor will ask the Bankruptcy Court to confirm this Plan by 11 U.S.C. § 119l(b) on Impaired Classes if any of those Classes does not vote to accept the Plan.

**B.**    **Liquidation Analysis**

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis, which analysis is attached as Exhibit 1 (the "Liquidation Analysis"). Under the Best Interest Test, if a claimant is in an Impaired Class and that claimant does not vote to accept the Plan, then that claimant must receive or retain under the Plan property of a value not less than the amount that such Holder would receive or retain if Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, Debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total

allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any. Here, because Debtor is a non-profit corporation, there are no interest holders that are entitled to residual equity distributions.

For the Bankruptcy Court to be able to confirm this Plan, the Bankruptcy Court must find that all creditors who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. Debtor maintains that this requirement is met here. Under the Plan, all of Debtor's non-exempt assets will be used to pay creditors in full and fund continuing operation of the Business, thus increasing value and maintaining the Business as a going concern. Because a Chapter 7 trustee will incur additional costs (including his or her fees under 11 U.S.C. § 326), and liquidate the assets of Debtor at a significantly reduced value, in a Chapter 7 scenario, although Secured Claims likely would still be paid in full, Administrative Claims, Priority Tax Claims, and Priority Unsecured Claims may not be paid in full, and General Unsecured Claims would receive less value on account of their Allowed Claims.

In other words, in a Chapter 7 case the Estate would incur additional administrative costs for professionals (*i.e.,* additional attorneys' fees and a substantial business broker's commission or auctioneer's commission for the sale of the Property) and Chapter 7 trustee fees. Confirming the Plan here will result in increased proceeds for the Estate and fewer administrative expenses. As a result, creditor distributions under the Plan are greater, or at least equal to, any distributions that would be made if this were a Chapter 7 case. Accordingly, for these reasons and as demonstrated below and in the Liquidation Analysis, the Best Interest Test is met in this Case.

The Liquidation Analysis summarizes the likely proceeds available for distribution to Holders of Claims under the Plan compared to if the Case were converted to a Chapter 7 case and the Business was liquidated under Chapter 7. Based on that Liquidation Analysis, the following chart shows the estimated percentage recoveries that creditors may receive under both scenarios, demonstrating that creditors will receive at least as much under the Plan as such creditor or interest holder would receive if the Case were converted and liquidated under Chapter 7.

| CLAIMS & CLASSES | PAYOUT PERCENTAGE UNDER PLAN | PAYOUT PERCENTAGE UNDER CHAPTER 7 LIQUIDATION |
|---|---|---|
| Administrative Claims | 100% | 98%-100% |
| Class 1: FCB Secured Claim | 100% | 100% |
| Class 2: Priority Unsecured Claim | 100% | 0%-100% |
| Class 3: General Unsecured Claims | 14%-20% | 0%-8% |

## VII.

## EFFECT OF CONFIRMATION OF PLAN

A.    **Discharge**

1.    **Confirmation under Section 1191(a)**

Debtor seeks confirmation of its Plan under section 1191(a) of the Bankruptcy Code.  Upon confirmation under section 1191(a), then pursuant to section 1141(d) of the Bankruptcy Code, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims and causes of action of any nature whatsoever, including any interest accrued from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and interests in, Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and causes of action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code. The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring. If the Plan is confirmed under section 119l(a), the service of the Subchapter V Trustee in the case shall terminate when the Plan has been substantially consummated.

2.    **Confirmation under Section 1191(b)**

If the Plan is confirmed under section 1191(b) of the Bankruptcy Code, then upon completion by Debtor or the Reorganized Debtor of all payments due under the Plan, the discharge

1    that would otherwise occur if the Plan were confirmed under section 1191(a) of the Bankruptcy Code

2    shall be deemed granted to Debtor to the extent provided in § 1141(d)(1)(A) of the Bankruptcy Code.

### B.    Revesting of Property in the Reorganized Debtor

4    Except as provided elsewhere herein, following the confirmation of the Plan under section

5    1191(a), confirmation of the Plan revests all of the property of the Estate in the Reorganized Debtor.

6    In addition, on the Effective Date, all of the claims against and/or interests in third parties that

7    constitute property of the Estate shall be revested in the Reorganized Debtor.  Following the Effective

8    Date, the Reorganized Debtor shall have absolute authority to prosecute, waive, adjust or settle any

9    claims without the need for approval by the Bankruptcy Court.  Following the Effective Date, the

10   Reorganized Debtor shall have the authority to employ such professionals as it deems necessary to

11   prosecute or defend such claims asserted without the need for Bankruptcy Court approval.

12   Following confirmation under § 1191(b), property of the Estate shall include the property

13   specified in § 541, all property of the kind specified in that section that Debtor acquires, as well as

14   earnings from services performed by Debtor, after the date of the commencement of the Case but

15   before the Case is closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code,

16   whichever occurs first. Except as provided in § 1185 of the Bankruptcy Code, the Plan, or the

17   Confirmation Order, Debtor shall remain in possession of all property of the Estate.  On the Effective

18   Date, Debtor's property and property of its Estate will be vested in the Reorganized Debtor.

### C.    Default

20   Except as otherwise provided herein or in the Confirmation Order, in the event that the

21   Reorganized Debtor shall default in the performance of any of its obligations under the Plan and shall

22   not have cured such a default within thirty (30) days after receipt of written notice of default from

23   the creditor to whom the performance is due, then the entity or individual to whom the performance

24   is due may pursue such remedies as available at law or in equity.  An event of default occurring

25   with respect to one claim shall not be any event of default with respect to any other claim.

### D.    Modification of Plan

27   Debtor may modify the Plan at any time before confirmation of the Plan pursuant to section

28   1193(a).  However, the Bankruptcy Court may require additional actions including re-voting on

the Plan. If the Plan is confirmed under section 1191(a), Debtor may also seek to modify the Plan at any time after confirmation only if (a) the Plan has not been substantially consummated and (b) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under Section 1191(b), Debtor may seek to modify the Plan at any time only if (1) it is within 3 years of the Confirmation Date, or such longer time not to exceed 5 years, as fixed by the Bankruptcy Court; and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

### E. Post-Confirmation Status Report

Within 120 days of the entry of the Confirmation Order, Debtor shall file a status report with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Plan. The status report shall be served on the UST, the Subchapter V Trustee, all Holders of Allowed Claims under the Plan and those parties who have requested special notice after the Effective Date. Further status reports shall be filed every 120 days thereafter and served on the same entities.

### F. Post-Confirmation Conversion/Dismissal

A creditor or party in interest may bring a motion to convert or dismiss the Case under §1112(b) after the Plan is confirmed, if there is a default in performing the Plan. If the Bankruptcy Court orders the Case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 Estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate. The automatic stay will be imposed upon the revested property, but only to the extent that the Bankruptcy Court did not previously authorize relief from stay during the Case.

The Confirmation Order may also be revoked under very limited circumstances. The Bankruptcy Court may revoke the Confirmation Order if such order was procured by fraud and if the party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the Confirmation Order.

**G.  Post-Confirmation UST Fees**

The Reorganized Debtor shall be responsible for timely payment of all fees incurred after the Effective Date pursuant to 28 U.S.C. § 1930(a)(6).  Under Subchapter V no fees will be due.

**H.  Final Decree**

Once the Estate has been fully administered as referred to in Bankruptcy Rule 3022, Reorganized Debtor or the Disbursing Agent, or such other party as the Bankruptcy Court designates in the Plan Confirmation Order, may file a motion with the Bankruptcy Court to obtain a final decree to close the Case.  Not later than thirty (30) days after the Plan is substantially consummated, the party seeking the final decree shall file a notice of such substantial consummation with the Bankruptcy Court and serve such notice on the Reorganized Debtor, Subchapter V Trustee, the UST, all Holders of Allowed Claims under the Plan and those parties who have requested special notice after the Effective Date.

Dated: February 17, 2022

By: _____
    Rock Zierman